Jessie **KIBERT**, Appellant,

v.

C. C. **PEYTON**, Superintendent of the Virginia State Penitentiary, Appellee.

No. 11126.

United States Court of Appeals
Fourth Circuit.

Argued May 4, 1967.

Decided Sept. 1, 1967.

---

Reno S. Harp, III, Asst. Atty. Gen., of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellee.

John J. Kirby, Jr., Charlottesville, Va. (Court-assigned counsel), for appellant.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

Petitioner, Jessie Kibert, was convicted in a Virginia court on two counts charging first degree murder and given two life sentences, "to be served concurrently." He appeals from the District Court's denial of his petition for a writ of habeas corpus, wherein he alleged that at the time of his trial he was insane and completely incompetent to understand the charges against him and the pleas of guilty entered on his behalf.

With his two brothers, petitioner was arrested on April 26, 1959 for the murder of their aunt and uncle the day before, and indicted on June 2nd of that year. Pleas of guilty were entered on June 4th for all three defendants and the cases were heard by a judge sitting without a jury. On June 20th, Kibert was transferred from the jail to the Virginia State Penitentiary, and upon arrival there, was immediately committed to its hospital section. The prison psychiatrist initially diagnosed his condition as "acute confusional state with depressive features," and over the next three months Kibert received approximately 15 electroshock treatments. On September 18, 1959, he was committed to Southwestern State Hospital for the mentally ill upon the prison psychiatrist's final diagnosis of "schizophrenic reaction—undifferentiated type." He was not discharged from that hospital until April 5, 1961, at which time he was returned to the penitentiary.

Kibert petitioned for state habeas corpus, and was granted a hearing on January 29, 1962. The court denied his petition, however, and the denial was upheld on appeal. He then sought habeas corpus relief in the District Court, alleging, as he had in his petition to the state court, that he was insane both before and during the trial. He asserts that he was dazed at the time and that he is unable to remember either the alleged murders or the trial; that he did not understand the charges against him or the pleas entered on his behalf; and that his trial and conviction, while incompetent and insane, violated due process.

The District Court dismissed Kibert's petition without a hearing, stressing that neither his attorney, with fifteen or sixteen years of experience, nor the trial court sought a psychiatric examination of Kibert pursuant to VA. CODE ANN. § 19.1–228 (1966 Cum.Supp.).[1] The District Court's opinion also relied upon the conclusory recital in the trial court's order that the petitioner "fully understood the nature and effect of his plea."[2]

---

[1] The District Court thereupon noted that "[i]t appears that there was unanimity among the legal experts present at the June 4 trial." 262 F.Supp. 694, 697 (W. D.Va.1966).

[2] Although the trial court's order recites that Kibert "fully understood the nature and effect of his plea," it is abundantly

evident from counsel's testimony in the state habeas proceedings that the court made no attempt whatsoever to ascertain this:

"[A]ll three of the pleas were entered at the same time * * * in the presence of the Court. During that time and I believe I am correct in this, *Jes-*

Finally, the District Court expressed agreement with the state habeas court's conclusion that since there was no *medical* evidence to substantiate the petitioner's contention that he was insane at the time of the trial, "other than findings made at a later date," the attack on his convictions could not succeed. A thorough review of the record in the state habeas proceedings, however, convinces us that the District Court was plainly in error in dismissing the petition, since for the reasons to be stated, the petitioner clearly established his incompetency to stand trial on June 4, 1959.

The fact that neither the attorney nor the trial court sought to have Kibert examined by a psychiatrist cannot, in the present circumstances, be taken as an indication of the prisoner's sanity. The attorney prior to trial had serious doubts as to Kibert's mental condition. Yet he put them aside and entered a plea of guilty solely on the basis of a mere nod of the prisoner's head when asked if he wanted such a plea entered on his behalf.[3]

The Commonwealth of Virginia has enacted a series of statutes which provide

see Kibert didn't say anything to the Court and I don't recall that the Court asked any questions of them." (Emphasis supplied.)

3. Although the attorney testified at the state habeas proceedings that he "thought" petitioner seemed to understand the matter of entering a guilty plea or he would not have entered such a plea in petitioner's behalf, his detailed account of his discussion with Kibert on the morning of the trial does not point to Kibert's competency to plead guilty, but contains disturbing suggestions of the very opposite.

"On the date of the trial, I might state to the Court what happened on that occasion. *It wasn't anticipated on that particular day that these cases would be disposed of or settled on the particular day.* They were set on the docket for the purpose of ascertaining what date we could try them * * *. So we appeared here at that date for the purpose of setting the docket. *Mr. Kedrick [co-counsel] and I had discussed the possibility but had not come to any conclusion of having an examination of Jesse Kibert.* * * * [S]ometime during that morning, * * * we had a proposal as to what the Commonwealth's Attorney would recommend to the Court in case there was a plea of guilty. * * I went into the room, Mr. Kedrick and I, with each of the three defendants, Jesse's wife, Lloyd's wife, and their mother and father, *and as to Jesse particularly, he didn't participate in the discussion and at first didn't respond to my questions which I explained to him in detail what the Commonwealth's Attorney would recommend in case of a plea of guilty. He made no response.* His brother,

Lloyd, and his mother and father all talked to him and explained it to him and told him 'Now, you have got to tell Mr. Williams and Mr. Kedrick here what you want to do.' And I asked Jesse, I said 'Now you understand the Commonwealth's Attorney will recommend two life sentences in case of a plea of guilty, and do you want to take that, do you want to enter a plea or not.' He nodded his head 'Yes' in the affirmative. I said 'Now I want to ask you the second time,' and I asked him again and he nodded his head in the affirmative. *As I recall, he never did actually speak but he nodded his head affirmatively. And on the basis of that all three of the pleas were entered* at the same time in all six of the cases, that is, six different pleas for three different defendants at the same time in the presence of the Court." (Emphasis supplied.)

The attorney, who was engaged ten days after Kibert's arrest, also testified at the hearing on Kibert's petition as to the defendant's behavior on those occasions when he visited him prior to his trial. This testimony demonstrates beyond question that Kibert was unable to assist in his own defense:

"Q. Mr. Williams, * * * would you describe his behavior as you observed it? * * *

A. * * * [I]n general appearance he had a sort of a stare and he did not respond to my questions concerning the case at hand.

Q. Did he respond to any kind of questions that you might have asked him?

A. He did occasionally to some questions relative to making the statement of shaking hands and saying 'I know you are my friend,' or something of that

that the court, counsel for the accused, or the state may obtain a hearing and commitment if doubts arise prior to trial as to the competency of defendant. VA. CODE ANN. §§ 19.1–227, 19.1–228, and 19.1–229. As we had occasion to observe in Thomas v. Cunningham, 313 F.2d 934, 939 (4th Cir. 1963):

"What emerges from this humane legislation is the assurance by the Commonwealth that one whose mental capacity to cope with the exigencies of a trial is in doubt shall not be put in jeopardy without a preliminary inquiry into his present mental condition."

█ The protection afforded the defendant by this legislation is illusory, however, if, when a reasonable doubt as to his sanity arises, neither court nor counsel seeks to utilize the procedures provided by the state for determining competency. Although the issue was not raised in court, it is clear from the attorney's testimony in the state habeas proceeding that he, at least, entertained substantial doubts as to his client's sanity. In similar circumstances, we held that the failure of the defendant's lawyer to explore the matter and adduce evidence in court where there was reason for doubt as to the mental condition of the accused, constituted a denial of his right to effective assistance of counsel. Owsley v. Peyton, 368 F.2d 1002 (4th Cir. 1966). See also Caudill v. Peyton, 368 F.2d 563 (4th Cir. 1966). The Supreme Court has held categorically that the defense of incompetency to stand trial cannot be waived by the incompetent, Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966), and it ineluctably follows that his counsel cannot waive it for him

by failing to move for examination of his competency.

█ Since, in these circumstances, neither counsel nor court acted to have the defendant examined at the time of his trial, the question may be raised in post-conviction proceedings. In the state habeas hearing, two psychiatrists were summoned to testify. The prison psychiatrist who examined Kibert on his arrival at the penitentiary read to the court his report, written after the initial examination: "Patient is confused, stuporous, preoccupied, and depressed." The failure of the extensive electroshock treatments to bring any significant improvement prompted the final diagnosis of "schizophrenic reaction undifferentiated type" and led to the patient's commitment to the Southwestern State Hospital. At the court's request, the prison doctor explained the basis for his diagnosis:

"A. It is a person who has regressed and withdrawn from reality. His concept formation, his reality relationship, and *his behavior is entirely not normal. He was walking around in a daze.* He didn't know the day, the month, the year or where he was, what he did. He read the Bible continuously. He was entirely in a different world. It was mixed, too, undifferentiated."

\* \* \* \* \* \*

"Q. Would you say that on June 23rd when you examined him, he would not have been responsible for his actions?

A. On June 23rd, when I examined him first, his contacts with reality were very limited. He was not responsible on June 23rd.

nature but he talked very little and did not respond to questions, no.

\* \* \* \* \* \*

Q. Mr. Williams, in your observing the behavior patterns of Mr. Kibert, what were your thoughts as to his actions?

A. His actions were *peculiar* \* \* \*

\* \* \* \* \* \*

A. \* \* \* [H]e was not responsive to questions and he stared, just stared

383 F.2d—36½

at you when you asked him a question. As I say generally he was reading the Bible and would carry it around in his hand, and Mr. Kedrick and *I got nowhere in questioning him about this specific case.* \* \* \* *[M]y further investigation of the case was derived from the other two defendants rather than from Jesse Kibert.*" (Emphasis supplied.)

\* \* \* \* \* \*

A. No, *he was not normal,* sir, between June 23rd and September 28th." (Emphasis supplied.)

Kibert was also diagnosed as "schizophrenic reaction acute and undifferentiated type" by the medical staff at Southwestern State Hospital. The Superintendent of the hospital described the symptoms which led to this diagnosis as follows:

"A. In his case, particular symptoms were *difficulty in thinking,* blocking, inadequate emotional reaction, *varied confusion.* There was some vague suggestion of paranoid trends to it. This confusion we consider as somewhat, as sort of catatonic feature.

Q. Did you make observations of the petitioner and could you describe to us some of his actions at the time you saw him the first time?

A. *It took him considerable time to reply to questions. He seemed to have interference with thinking.*

\* \* \* \* \* \*

A. *His speech, his talking, was at times slow as if he had difficulty thinking* and at times it seemed as if there were interrupting trends of thought within his own mind which would make him *seem inattentive and then all of a sudden look up as if he had not been listening too well as if there were some incoherent trend of thought.* He did not seem to be actually hearing the voices. He was not actually elucidated [hallucinating?] that we could tell. He would *seem in a study part of the time,* and part of the time he seemed overly cheerful and crying.

\* \* \* \* \* \*

A. \* \* \* We felt that he was definitely mentally ill and was showing this schizophrenic picture and ill in that he had *blocking of thinking, difficulty of thinking,* unduly emotional. He was retarded in his thinking. He was at times *apathetic and in rather poor contact with his environment.* The whole picture was enough to make us feel that he was very definitely in that psychotic category." (Emphasis supplied.)

■ Despite the telling force of the testimony of the two psychiatric witnesses as to Kibert's mental condition on June 23 and in the following weeks, they were prevented from expressing their expert opinions as to the origins or date of the onset of petitioner's mental illness. Nor were they permitted to answer such questions based on observations of others made prior to and at the trial. On persistent objections by the Assistant Attorney General, the court limited the doctors' answers to what they learned through direct observations of the prisoner. It is elementary that an expert witness is permitted to take into account the testimony of others as to what they observed, and upon his interpretation to offer an informed professional opinion. Yet here, unaccountably, the psychiatrists were restricted to their direct observations.

The inquiry was further prejudiced by other exceedingly narrow rulings. As noted above, the State took the highly legalistic position that because the psychiatrists' examinations were not made till after the June 4 trial, namely on June 23 and later dates, they should not be permitted to express any opinion as to the defendant's mental condition at trial. Accordingly, Kibert's attorney sought to span the asserted gap of 19 days by offering lay testimony as to the defendant's behavior shortly before and during the trial. Questions were asked of Kibert's relatives, trial counsel and even the sheriff and jailer, but their answers, which appear in the record,[4] were uni-

4. Seven of the petitioner's relatives testified at the state habeas hearing that on their several visits to the defendant during the approximately five weeks he was in jail awaiting trial, he appeared to be in a daze, stared off into the distance, and spoke infrequently, if at all. In attempting to describe his behavior, they stated that he acted "strange," or "funny," that he "didn't act normal," "he acted as if though he didn't have his right mind," he "just seemed like he was staring is the best I know how to put it," that "it really didn't seem like he knew anyone or any-

formly objected to and the objections were uniformly sustained on the ground that it was opinion testimony by laymen.

A reading of the record shows that their testimony merely described Kibert's behavior as they observed it. They gave no conclusory opinions as to sanity, but in layman's language these uneducated and unsophisticated persons told what they saw. Their depiction of Kibert's behavior in early June parallels the descriptions given by the psychiatrists themselves, particularly the portions we have italicized. The only distinction between the lay witnesses' description of the defendant's behavior at the time of trial and that given by the psychiatrists from their objective observations three weeks after the trial, is that the psychiatrists added the technical name for the type of illness manifested by the defendant's symptoms.

■ The lay testimony, taken in conjunction with the psychiatrists' diagnosis of psychosis, made only three weeks after the trial, demonstrates that Kibert was incompetent at the time of the trial. Cf. Jacobs v. United States, 350 F.2d 571 (4th Cir. 1965). Moreover, had the psychiatrists been permitted to take into account the lay testimony, it is evident that the psychiatrists' diagnosis could not have been other than that Kibert was insane at the time of his trial.

We think that the state habeas judge took an unduly circumscribed view of what could be considered in determining the issue of the defendant's competency when he excluded the lay testimony altogether and sharply limited that of the psychiatrists.

At the state habeas proceedings, the only testimony introduced by the Commonwealth touching the petitioner's mental condition was that of a newspaper publisher who had interviewed Kibert shortly after his arrest. He related that Kibert, having first refused to give a

statement and picture, was put into a cell with his two brothers and, together with them, then made a statement and posed for pictures. The newspaperman said that Kibert appeared to be "directing" the other two brothers. This is too inconsequential to be afforded any weight in view of the overwhelming testimony to the contrary, including that of the totally disinterested state psychiatrists and the sheriff and jailer, who certainly cannot be suspected of bias in favor of the prisoner.

■ We hold, on the basis of the complete transcript of the state habeas proceedings, that it has been firmly established that the petitioner was incompetent to stand trial. Under the circumstances, in accordance with Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966), we reverse and direct the District Court to grant the writ of habeas corpus to Jessie Kibert, and order his release unless the Commonwealth of Virginia elects to retry him within a reasonable time.

Reversed and remanded with directions.

---

thing," "he wouldn't recognize any of us," "he didn't pay any attention at all," "he would just look at us as though he didn't even know us," "he didn't know whether I was his uncle or not," "he would respond as if he didn't realize who he was talking to," "he acted queer."