**L. P. KIBERT, Petitioner,**

v.

**W. D. BLANKENSHIP, Respondent.**

**Civ. A. No. 75–0690.**

United States District Court,
W. D. Virginia,
Abingdon Division.

July 20, 1978.

Stephen A. Saltzburg, Professor of Law, Charlottesville, Va., for petitioner.

Burnett Miller, III, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION and JUDGMENT

TURK, Chief Judge.

Petitioner, Lloyd P. Kibert, is once again before the court seeking a writ of habeas corpus. The current petition was filed on October 23, 1975 and constitutes the latest in a prolonged series of attempts by petitioner to overturn his convictions for two counts of first degree murder. The history of these various attempts is complex but must nevertheless serve as a logical introduction to the issues currently before the court.

### I

Lloyd Kibert, along with his older brother Jessee and his younger brother Le Junior, was arrested on April 26, 1959 for the murders of his aunt and uncle. Ten days after the arrest, the brothers' family employed two attorneys to represent all three. Before the attorneys had been retained, Lloyd had made a confession and had given interviews to a local newspaper for a story about the murders. After a preliminary hearing, the charges were certified to a grand jury which subsequently returned short form indictments for murder.

There are disputes in the testimony as to the role played by the attorneys during the period prior to the defendants' first and only trial appearance. The disputes revolve around the meetings between defendants and counsel, and specifically concern the frequency of such meetings, the parties to the meetings, and the matters discussed at the meetings. There is definite disagreement as to whether the defendants were ever interviewed individually.

On June 4, 1959, the attorneys, defendants, and the defendants' families appeared at the Lee County Courthouse for the purpose of setting a trial date. At the hearing conducted on the instant petition, Lloyd Kibert testified that on that day, he told his attorneys that he would take whatever sentence the court directed. Counsel then undertook, for the first time, to open discussions with the Commonwealth's Attorney as to a possible plea bargain. An agreement was reached whereby the Commonwealth, in return for pleas of guilty, would recommend two life sentences to run concurrently for Lloyd and Jessee and two thirty year sentences to run concurrently for Le Junior. Le Junior's two thirty year sentences were later reduced to two twenty year sentences, still to run concurrently. The brothers then went before the trial judge and their attorneys proceeded to offer the guilty pleas. The transcript reveals that the trial judge did not question the defendants about their pleas. Indeed, the Kiberts did not speak at all during the entire proceeding before the judge. Moreover, the trial judge did not recite the charges contained in the indictments nor did he take any evidence as to the basis of the pleas. No one raised any question as to the propriety of all three defendants being represented jointly and simultaneously by the same counsel.

Thus, on what had originally been the day intended for setting a trial schedule, the trial judge accepted guilty pleas and proceeded to render sentences consistent with the plea bargaining arrangement. The oldest brother, Jessee, spent his first years of incarceration at a mental hospital. The United States Court of Appeals for the Fourth Circuit later directed that Jessee be granted a writ of habeas corpus on the grounds that he had obviously been incompetent to stand trial. *Kibert v. Peyton,* 383 F.2d 566 (4th Cir., 1967). A state habeas hearing had been conducted on the Jessee Kibert petition. The testimony adduced at that hearing provides an interesting summary of the events which transpired between the time of the brothers' arrest and the entry of their guilty pleas. During that period, Jessee had become an almost total vocal recluse, spurning communication with his family, friends, and attorneys. When spoken to, he would merely stare into space. The instant petitioner, Lloyd, testified that he was obviously concerned about Jessee's

uncharacteristic behavior and consequently directed much of the discussions with counsel to the possibility of sending Jessee to a mental hospital.

The uncontroverted testimony is that Jessee did not speak a word during the entire day on which the guilty pleas were entered. Jessee demonstrated his consent to his attorneys' entry of his own guilty plea merely by an affirmative nod. At the same time, the third brother, Le Junior, was scarcely able to communicate because of a severe speech impediment. In short, the defense attorneys were representing three clients jointly, each of whom was charged with two capital offenses. One client was insane, one was physically unable to communicate, and one was the instant petitioner.

Lloyd Kibert petitioned the Virginia Supreme Court for a writ of habeas corpus and received an evidentiary hearing on his petition on December 20, 1968, in the Circuit Court of Lee County.[1] The petition was eventually denied as were subsequent petitions for a writ of error and for rehearing. Kibert first filed a habeas petition in this court on July 3, 1972. That petition was based on the following grounds: involuntary confession and guilty plea; ineffective assistance of counsel; prejudicial pretrial publicity; failure to advise him of his right to remain silent or to have an attorney at post arrest interview; illegally seized evidence; insanity at time of trial; failure to have the warrant and charges read to him in open court; denial of the right to appeal; and conviction without the introduction of any evidence of guilt. In *Kibert v. Slayton*, 356 F.Supp. 760 (W.D. Va., 1973), this court granted the petition on the ground that the Commonwealth deprived Kibert of due process through its failure to introduce evidence of premeditation. The court based its opinion on the view that, under Virginia law, murder was presumed to be in the second degree, unless the indictment specifically stated otherwise, and that the Commonwealth had the burden to elevate the crime to first degree murder.

On appeal by the Commonwealth, the United States Court of Appeals for the Fourth Circuit reversed this court, finding an absence of exhaustion of state remedies. *Kibert v. Superintendent*, Mem.Dec. No. 73–1660 (4th Cir., May 29, 1974). The question of elevation of second degree murder was then heard by the Virginia Supreme Court. The Virginia Supreme Court settled the issue, which had given rise to no little confusion, holding that a plea of guilty under such an indictment was to the highest form of the offense charged, thus precluding the necessity for the trial judge to hear evidence of premeditation or, for that matter, any evidence in support of the plea. *Kibert v. Commonwealth*, 222 S.E.2d 790, 792 (Va., 1976).

Kibert filed another *pro se* petition with this court on October 23, 1975. Appointed counsel has since filed an amended petition and newly appointed counsel has further restated and amplified Kibert's claims by letter to the court dated February 20, 1978. It was to these claims that respondent answered. The issues were further developed at an evidentiary hearing conducted on March 9, 1978. The allegations raised in the instant complaint, as refined by the aforementioned letter of February 20, 1978, may now be stated as follows:

1. Kibert maintains that he never entered a plea of guilty or permitted such a plea to be entered for him. He states that the plea actually entered was without his consent and that defense counsel were mistaken in believing he wished to plead guilty.

2. Kibert asserts that in indicating to his attorneys that he would take whatever sentence the court directed, he was only offering to take whatever punishment that might be imposed on his brother Jessee, should the latter stand trial and be convicted.

3. Petitioner alleges that he never intentionally entered a plea of guilty and that his attorneys conducted all his communication with the trial judge. Indeed, Kibert claims that he understood the purpose of

1. Hereinafter, the name Kibert will only be used in reference to the instant petitioner.

the court that day to have been a determination as to whether Jessee would be sent for treatment before standing trial.

4. Kibert maintains that trial counsel could not adequately represent all three defendants simultaneously. He further insists that he was never advised that, in attempting to protect Jessee, he might be endangering his own penal interests.

5. Petitioner asserts that the meaning of a plea of guilty was never fully explained, given the rapidity of events, the confusion created by having all the brothers and their respective families together during the discussion, and the difficulty caused by Le Junior's speech impediment and Jessee's insanity.

6. Kibert continues to maintain that the trial court's failure to make some evaluation of the supportive evidence constituted an unconstitutional denial of due process.

## II

■ In undertaking its evaluation of the merits of the petition, the court recognizes that despite the obviously harsh circumstances attendant to the Circuit Court proceedings, the trial judge was laboring at a time prior to the assimilation of many of the landmark criminal rights decisions into actual trial practice. Nevertheless, there are fundamental rights which remain constant regardless of the time frame. Moreover, a determination as to the voluntariness of a plea requires a factual analysis governed as much by common sense and understanding of the individual involved as by hard case law. As expressed by the Supreme Court in *Brady v. U. S.*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), in determining the voluntariness of plea, there must be a consideration of "all the relevant circumstances surrounding it". The standard itself is a simple one: a guilty plea must be a voluntary expression of a criminal defendant's own choice and must be a knowing, intelligent act made with "sufficient awareness of the relevant circumstances and likely consequences". *Brady v.*

*U. S., supra* at 748, 90 S.Ct. at 1469. After consideration of the relevant circumstances, the court can only determine that the pleas of guilt entered for petitioner were beset by a total misunderstanding of the impact and consequences on the part of the person purportedly making the pleas.

Stated in the abstract, the thrust of petitioner's allegations is almost fantastic. Kibert states that he believed that in agreeing to take what the court offered him, he was really intending to protect his older brother by serving any sentence that might be levied on Jessee. Worded perhaps more articulately, petitioner seems to have believed that he was offering the court a guarantee: if the court would send Jessee for mental treatment (hopefully to return Jessee to his former self) he (petitioner) would guarantee to serve any sentence that might be deemed appropriate for Jessee. Kibert stated that he finally understood what had actually happened only after he had returned from sentencing.

Stated in light of the circumstances which prevailed on that day and in light of the circumstances that developed subsequently, petitioner's allegations retreat from the verge of the fantastic to become reasonable, credible, and totally consistent. In 1959, Lloyd Kibert had a second grade education. His limited educational background was undoubtedly masked somewhat to the officers of the court due to both his fluency with the Bible and the marked contrast in which he stood in comparison to his non-communicative brothers. In 1959, Lloyd Kibert had no previous experience with legal proceedings. After his arrest, much of the valuable time he spent with his attorneys was devoted to communicating with Le Junior and attempting to determine the solution for Jessee's sudden introversion. It is uncontroverted that on the day on which the entourage went to the courthouse to set a trial date, all parties expected some determination to be made as to whether Jessee would be sent to a mental hospital for examination.[2] Given that

---

2. Memorandum of Law in Reply to Petitioner's Memorandum and in Support of Denying the

Petitioner's Petition for a Writ of Habeas Corpus at 3.

understanding, it is not unreasonable for petitioner to have thought that some disposition was actually being made on that question. Indeed, Kibert's testimony is that his attorneys had told him that Jessee should go to the state mental hospital. With an almost obsessive belief in the need for such treatment to restore Jessee, it is not unreasonable that petitioner should have made every effort to achieve the desired end.

As described in the testimony adduced at the hearing on the instant petition, the atmosphere of that day proves totally consistent with petitioner's allegations coming more than a decade later. As might be expected, it was not a tranquil scene. The potential plea bargain came as a new and unexpected development. The three brothers and their families, including small children, met with the attorneys in a small room in the back of the Lee County Courthouse. When the attorneys reported the offer of the Commonwealth's Attorney, all efforts were directed toward Jessee who had not and would not speak a word during the entire discussion. In this impossible situation, defendants' attorneys attempted to learn Jessee's disposition which was finally evidenced by an affirmative nod. There is no indication that any effort was directed toward petitioner which might have disabused him of his mistaken notion concerning the meaning of the agreement. There is no indication that alternate trial strategies were discussed at that time. Indeed, after Jessee's affirmative "nod", the remaining time prior to the actual court appearance was spent in negotiating Le Junior's thirty year sentences down to twenty year sentences. In these frantic circumstances, the attorneys simply could not have ascertained petitioner's true meaning, nor explained to petitioner the meaning of the upcoming proceedings.

The formal proceeding itself did not serve to eliminate the confusion. In the abbreviated proceeding, none of the defendants spoke a word. The overwhelming testimony from the hearing on the instant petition, and from Jessee's and Lloyd's state habeas hearings, is that the judge did not read the indictments, address the criminal defendants, or take any evidence in support of the pleas. Simply stated, nothing occurred on the day in question which could possibly be viewed as inconsistent with the allegations petitioner would now have the court accept.

The chapter of paramount importance in this case was written eight years after the convictions for murder. As previously noted, the determination of the intelligence and voluntariness of a plea requires examination of the actual circumstances involved. *Brady v. U. S., supra.* Stated on their face, petitioner's allegations could be viewed as an opportunistic attempt to take advantage of brother Jessee's failure to communicate. However, the United States Court of Appeals for the Fourth Circuit has ruled as a matter of law that Jessee had been incompetent to stand trial. Jessee's behavior must be viewed as having been a manifestation of what was later diagnosed as schizophrenic reaction—undifferentiated type. See *Kibert v. Peyton, supra* at 567. Petitioner was no psychiatrist, but he knew that his brother was not behaving normally. The history of the period between the arrest and arraignment is replete with examples of petitioner's desperate attempts to communicate to the officers of the court that Jessee needed help. Given his attorneys' assurances, he had every reason to believe that help would be forthcoming after the initial trial appearance on June 4, 1959. The petitioner had no reason to believe that the proceeding would result in final disposition on the charges and indeed the Fourth Circuit has found that the proceeding *should not* have resulted in final disposition.[3]

In summary, the court finds that petitioner's plea was not made in a voluntary and intelligent manner. His allegation con-

---

3. If Jessee's incompetency had been recognized, final disposition could not have occurred on that day inasmuch as the Commonwealth's plea bargaining offer necessitated a package plea.

cerning his understanding of the plea finds support in all the relevant circumstances considered by this court. His "offer" to accept any sentence was directed to what he perceived to be a future time when Jessee would have returned from the hospital. His plea was made without an understanding of the immediate consequences and thus was not an informed plea which later proves to have been miscalculated, such as those pleas in the *Brady* triology.[4] His plea can only be viewed as meaningless, both in fact and law.

### III

The conclusion to grant the writ is also necessitated by the trial judge's failure to question the defendants as to their understanding of their pleas. Although the trial court's order states that each brother "fully understood the nature and effect of his plea", the Fourth Circuit has already found that the trial court made no effort to ascertain whether the brothers understood their pleas, and actually never questioned or addressed them at all. *Kibert v. Peyton, supra,* at 567–568, n.2. The trial record in this case is similar to the silent record that the U. S. Supreme Court has since held to be insufficient to support the waiver of constitutional rights encompassed by a guilty plea. *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

*Boykin* is not retroactive. *Smith v. Cox,* 435 F.2d 453 (4th Cir., 1970). However, the pre-*Boykin* standard in this circuit provided that while no particular form or ritual was necessary, "it must appear that the defendant understood the consequences of his plea". *Bailey v. MacDougall,* 392 F.2d 155, 159 (4th Cir., 1968), *cert. denied* 393 U.S. 847, 89 S.Ct. 133, 21 L.Ed.2d 118 (1969). In that case, the Fourth Circuit granted the petitioner's writ because no one at the formal arraignment had ascertained whether petitioner actually understood the consequences of the guilty plea he had entered.

The burden of showing knowledge of the consequences lies with the state. *Bailey, supra* at 161. That case is controlling here, and the Commonwealth has clearly not met its burden.

### IV

The court also finds that petitioner was deprived of constitutional rights both by the failure of counsel to raise an insanity defense for Jessee and by the joint representation of three defendants, each of whom was charged with two capital crimes. See, gen., *Glasser v. U. S.,* 315 U.S. 60, 76–77, 62 S.Ct. 457, 86 L.Ed. 680 (1942). As the sequence of events developed, it is clear that the trial strategy for all three defendants turned on the resolution of the problem of Jessee. The plea bargain offered by the Commonwealth was limited to a "package deal" whereby all three defendants were to plead simultaneously. Yet, the Fourth Circuit has ruled that Jessee should not have been called upon to plead at all. Obviously, it was highly prejudicial for petitioner's case to have been tied to that of his brother, especially since that brother should not have been allowed to enter a guilty plea. The situation becomes even more aggravated when it is realized that petitioner's primary objective had become the protection of Jessee rather than his own defense. The potential prejudice became actual when the package plea bargain was accepted by the court.

Moreover, as previously noted, the pretrial interviews between defendants and counsel were dominated by the enigma of Jessee's changed mental condition. Little time was spent in assisting petitioner in understanding his own status and rights. Furthermore, there is testimony indicating that the brothers may have played different roles in the murders of their aunt and uncle. The victims' child testified at the preliminary hearing that he could identify Jessee and Le Junior but could only see the third person's legs. This may have indi-

---

4. *Brady v. U. S.,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).

cated that the third brother was not in the same vicinity. There was further testimony that Jessee had been the dominant figure of the trio.[5] Jessee had previously been in jail in Lee County whereas Lloyd had no prior criminal record. Indeed, had Jessee's mental state been clearly defined, the potential for argument for a lesser degree of complexity on the part of the remaining two brothers would certainly have been present. All these facts could have had a bearing on the degrees of participation of the brothers in the crimes and would have been considered in a separate sentencing arrangement. Obviously, the joint representation precluded such usage, especially since Jessee was still considered to be a competent defendant.

As noted above, the trial judge made no effort to satisfy himself that there was no conflict by virtue of the joint representation. Given Jessee's mental aberrations, it is remarkable that the possibility of such conflict was apparently not even considered. The duty of the trial judge in such circumstances was articulated in *Glasser, supra* 315 U.S. at 71, 76, 62 S.Ct. 457, and has recently been restated in *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

Some circuits impose upon the trial judge the duty to inquire into possible conflicts in cases in which criminal co-defendants are represented by the same attorney. When this duty has not been performed, the burden of proof on collateral attack to show that the defendant was not prejudiced from such joint representation shifts to the state. The petitioner asks this court to adopt this rule. Petitioner argues that the rule has been adopted in those circuits that require a showing of actual prejudice to a criminal co-defendant from joint representation[6] rather than the lower standard of possible prejudice used in other circuits. Petitioner further argues that the Fourth Circuit may have adopted the "actual prejudice" standard in *United States v. Atkinson*, 565 F.2d 1283 (4th Cir., 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978), this circuit's most recent statement on the issue of joint representation.

Inasmuch as this court has found that the petitioner has suffered actual prejudice, there is no necessity to determine whether the Fourth Circuit now requires a showing of actual prejudice through joint representation as opposed to a showing of possible prejudice. *Sawyer v. Brough*, 358 F.2d 70, 73 (4th Cir., 1966). For the same reason, it becomes unnecessary to either adopt or reject a rule shifting the burden of proof to the respondent whenever the trial judge fails to ascertain whether criminal co-defendants have intelligently and competently chosen to be represented jointly.

V

For reasons stated above, the court is constrained to conclude: (1) that petitioner did not enter a voluntary and intelligent plea, (2) that the trial judge failed to determine whether the guilty plea constituted a knowing waiver of valuable constitutional rights, and (3) that petitioner was deprived of valuable rights under the Sixth Amendment by virtue of joint representation of himself and a second, incompetent defendant. Simply stated, the personal ties between petitioner and his insane brother overwhelmed and transcended the criminal proceedings. Given such a situation, the commingling of the legal postures of the two brothers was both improper and unconscionable, and led to a result which can only be deemed unconstitutional. Accordingly, the writ must issue.

---

5. Transcript of hearing, Circuit Court of Lee County, January 29, 1962, at 112–114.

6. See, e. g., *United States v. Foster*, 469 F.2d 1 (1st Cir., 1972); *Lollar v. United States*, 126 U.S.App.D.C. 200, 376 F.2d 243 (1967).