Lloyd Paskel KIBERT, Appellee,

v.

**W. D. BLANKENSHIP, Appellant.**

**Lloyd Paskel KIBERT, Appellant,**

v.

**W. D. BLANKENSHIP, Appellee.**

Nos. 78–6461, 78–6462.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1979.

Decided Dec. 4, 1979.

Burnett Miller, III, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen., Richmond, Va., on brief), for appellant in No. 78–6461 and for appellee in No. 78–6462.

Larry J. Ritchie, Georgetown University Law Center, Washington, D. C., App. Litigation Clinic, and Patricia Collins, Third Year Law Student (Michael E. Geltner, Washington, D. C., and T. Samuel Shomaker, Third Year Law Student, on brief), for appellee in No. 78–6461 and for appellant in No. 78–6462.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

FIELD, Senior Circuit Judge:

The Commonwealth of Virginia appeals from an order of the United States District Court for the Western District of Virginia granting habeas corpus relief to Lloyd Paskell Kibert. *Kibert v. Blankenship,* 454 F.Supp. 400 (W.D.Va. 1978).

The petitioner, together with his brothers, Jessee and LeJunior, was arrested on April 26, 1959, in Lee County, Virginia, for the ambush killings of his aunt and uncle. Several days after the arrest the family of the three brothers employed two attorneys to represent them. On June 4, 1959, all three entered guilty pleas, and the petitioner received two life sentences to run concurrently. No appeal was taken but over the past ten years Kibert has sought to overturn his convictions through a series of post-conviction proceedings.

On April 16, 1968, Kibert filed a petition for a writ of habeas corpus in the Supreme Court of Virginia, alleging, *inter alia,* that his confession and guilty plea were involuntary and that he was denied effective assistance of counsel. A plenary hearing on this petition was held in the Circuit Court of Lee County on December 20, 1968, and on March 5, 1970, the state court filed its opinion in which it found that Kibert's plea of guilty was voluntary and that he had received effective assistance of counsel. A petition for a writ of error was denied by the Supreme Court of Virginia on December 7, 1972.

Thereafter, on July 3, 1972, Kibert filed a petition for habeas corpus relief in the United States District Court for the Eastern District of Virginia, alleging that (1) his guilty plea and confession were involuntary; (2) he was not advised of his right to remain silent or have an attorney; (3) pretrial publicity made a fair trial impossible; (4) he was denied effective assistance of counsel; (5) evidence was illegally seized; (6) warrants were not read to him; (7) charges were not read to him; (8) he was tried and sentenced while wearing handcuffs in open court; (9) he was denied a right to appeal; (10) he was insane at the time of trial; and (11) he was convicted

without the introduction of evidence of his guilt. The case was transferred to the Western District of Virginia and on March 19, 1973, the court granted the writ. *Kilbert v. Slayton,* 356 F.Supp. 760 (W.D.Va. 1973). In his opinion, the district judge observed that there had been an adequate factual development in the state court proceeding and, based upon his review of the state record, he concluded that Kibert's confession of the crime was voluntary and, similarly, his guilty plea was entered voluntarily and with a sufficient understanding of the consequences thereof. The court concluded, however, that Kibert's plea of guilty to the Virginia short-form indictment was only a plea to second degree murder, and that it was incumbent upon the Commonwealth to present evidence to the court to elevate the crime to first degree murder. It was on this basis that relief was granted.

The Commonwealth appealed and in an unpublished memorandum opinion, *Kibert v. Superintendent, Virginia State Penitentiary,* No. 73–1660 (4 Cir. May 29, 1974), we concluded that the Virginia courts should have an opportunity to determine whether evidence was necessary to support such a plea of guilty and, accordingly, remanded the case to the district court with instructions to dismiss the petition without prejudice. Incident to our consideration of the appeal, however, we concluded that Kibert had voluntarily and knowingly entered his guilty plea and that the record in the state habeas corpus proceeding established that he was aware of the consequences of his plea and was not denied the effective assistance of counsel. After a subsequent state petition was denied by the Circuit Court of Lee County, Kibert appealed to the Virginia Supreme Court which held that his plea of guilty to the short-form murder indictment was a plea to first degree murder and that Virginia law did not require evidence to support it. *Kibert v. Commonwealth,* 216 Va. 660, 222 S.E.2d 790 (1976).

Prior to the decision of the Virginia Supreme Court, Kibert had refiled his petition in the district court presenting substantially his old allegations. During the time the case remained on the docket, the court appointed and relieved various counsel for Kibert, some of whom filed amendments for him. Kibert's final counsel was Professor Saltzburg of the University of Virginia Law School, and in an effort to clarify the issues Saltzburg filed a specification of Kibert's claims as follows: (1) petitioner [Kibert] did not enter or allow a plea of guilty to be entered in his name, and the plea entered by his attorney was without his consent; (2) petitioner's counsel at his criminal trial was mistaken that Kibert agreed to plead guilty, and he persistently stated that he was not guilty; (3) the only deal that Kibert had indicated he would accept was one in which he would take whatever punishment the court imposed on his brother, Jessee, if Jessee were ever tried and convicted; (4) Kibert never spoke any words indicating that he would enter or accept a plea of guilty, and his trial counsel did all of the talking in the courtroom; (5) Kibert expected that after Jessee was cured of his mental illness he would be tried for murder and only if Jessee were convicted, would the petitioner stay in prison to serve Jessee's term; (6) trial counsel was not capable of handling the interests of all three brothers at the same time; (7) trial counsel was so engrossed in talking to the three brothers and their family on the day they appeared in court that he entered their pleas of guilty without explaining to the petitioner what was taking place; (8) the petitioner had done everything within his power to bring these facts to the attention of the state and federal courts, but no one had paid attention to his allegations. This specification of Kibert's claims was characterized by Saltzburg as being "the supporting facts for the claims of 'an unknowing and involuntary plea' and 'ineffective assistance of counsel'." Saltzburg also noted the presence of another claim which challenged the constitutionality of the Virginia procedure under which no evidence supporting the guilty plea was presented to the court.

The district court conducted a plenary hearing on March 9, 1978, during which Kibert and his younger brother, LeJunior,

testified, as well as the Honorable Glen M. Williams,[1] who was one of the two attorneys who represented Kibert at the time he entered his plea of guilty. On July 20, 1978, the district judge filed a written opinion in which he again granted Kibert habeas corpus relief. Relief was predicated upon the following grounds: (1) that Kibert did not enter a voluntary and intelligent plea of guilty; (2) that the trial judge failed to determine whether the guilty plea constituted a knowing waiver of Kibert's constitutional rights; and (3) that the petitioner was deprived of his rights under the Sixth Amendment by virtue of the joint representation of himself and his two brothers. The Commonwealth has appealed from this order of the district court.

In reviewing the action of the district court, we turn first to the evidence presented in the state post-conviction hearing on December 20, 1968. At that hearing Kibert testified that he had been present at the scene of the shooting but left and went to his parents' home. He later returned to the scene and told the investigating officers "I did it." He was arrested and taken to jail where he was questioned and signed a full written confession. At that time he had no attorney and was given no advice concerning his constitutional rights. Later in the week a newspaper reporter visited the jail and Kibert gave him an interview concerning the killings. Kibert testified, however, that he had not given the reporter the true story of what had happened because he "was going to take the load." He explained that it was his understanding that his brother, Jessee, had done the shooting and that he desired to take the blame himself because Jessee was insane at the time. Kibert testified that he first saw his attorney, Williams, about a week after he was arrested, and that he had several brief interviews with Williams prior to the day on which he entered his guilty plea. He stated, however, that Williams never discussed with him the seriousness of the crime or the possibility of the death penalty. On June 4th Kibert and his brothers, together with

their family, met with Williams and another attorney, Roger Kevitt, at the court house, and it was at this time that the possibility of a guilty plea was first mentioned. In this regard Kibert testified: "I was the one that brought up the plea of guilty myself. I didn't use the word plea of guilty. I used the word to take what they offered me. That's the way I used it, and I was thinking at that time, I didn't know I was thinking, I could take what they offered me without pleading guilty to the charge but I was told later I couldn't. This was after I got to the penitentiary." Transcript at 46. Kibert stated that Williams appeared to be opposed to such a plea but that he negotiated with the Commonwealth's attorney and an agreement was reached whereby the Commonwealth, in return for pleas of guilty, would recommend two life sentences to run concurrently for Lloyd and Jessee, and two concurrent thirty year sentences for LeJunior. Kibert did testify that prior to the discussion of the guilty plea he had told the attorneys that he was guilty of the crime.

In contrast to Kibert's testimony, Judge Williams testified that he, together with Roger Kevitt, worked continuously on the case for the three brothers from April until they entered their pleas on June 4th, and that he saw one or the other of them on almost a daily basis. Specifically, Judge Williams stated that he discussed with Kibert his confession, the serious nature of the crime, the elements of the offense of first degree murder, and the possible penalties that could be imposed. Williams further testified that from the very first Kibert wanted to plead guilty and thereby avoid trial and the possibility of a death penalty. Williams stated that at the court house on June 4th he advised Kibert that he was pleading guilty to first degree murder and pointed out to him the various constitutional rights which would be waived in the event a guilty plea was entered.

In disposing of Kibert's first petition, the district judge reviewed this evidence which had been developed in the state post-convic-

---

1. Now United States District Judge for the Western District of Virginia.

tion proceeding, and found that the petitioner's plea was voluntary. *Kibert v. Slayton, supra,* 356 F.Supp. at 764. And as we have noted, in considering the appeal in that case, we reviewed the state court record and concluded that Kibert voluntarily and knowingly entered his plea of guilty, and that the state court finding that he was not denied the effective assistance of counsel was amply supported. *Kibert v. Superintendent, Virginia State Penitentiary,* No. 73–1660 (4 Cir. May 29, 1974).

At the hearing in the district court on March 9, 1978, Kibert's testimony was somewhat at variance with that given by him in the state court proceeding almost ten years earlier. In the district court Kibert testified that he talked with his attorneys, Williams and Kevitt, on three or four occasions between the time they were retained and the entry of his plea on June 4th. He stated, however, that most of the discussions centered upon Jessee's mental condition, and that the attorneys would talk with the three brothers for "maybe an hour or maybe two hours at times." When asked who committed the murders, Kibert responded that "possibly my brother could have been involved. And I don't know if he could have or could have not." Kibert again denied that Williams discussed with him the seriousness of his case or the evidence that the state had against him. As we have noted, Kibert's testimony was in several respects at variance with his testimony in the state court proceeding, and when confronted with such discrepancies Kibert challenged the accuracy of the state court transcript. As an example, when asked about his statement to the officers at the scene of the murder he testified that he did not use the words "I did it" but that what he meant was "I would take the responsibility." When pressed on the point, Kibert again challenged the accuracy of the state transcript. Bearing upon his relationship with Williams as his attorney, Kibert's testimony was summarized by the following question and answer:

Q. This is reiteration Mr. Kibert, but you're telling us again in all of these times that Mr. Williams sat there and discussed your brother's case with you, he never mentioned anything at all to you about the fact that people had been killed and that you were charged with it; the fact that you had confessed to these murders; and the fact that you had confessed them to the police officers and to the news reporters; he didn't say anything like that to you at all?

A. No, sir. We did not discuss any of this matter whatsoever. All we discussed, prior to trial, was my brother's condition. And like I said a minute ago, in discussing my brother's condition, Mr. Williams was talking to my brother and, I think, at the time when I mentioned, I said I would take what the Court offered me.

Transcript at 82. Finally, Kibert denied that he had ever discussed with Williams his involvement in the crime.

Williams' testimony in the district court with respect to his representation of Kibert and his brothers was substantially the same as that given by him in the state court proceeding. Specifically, Williams testified that he discussed the case in detail with Kibert on numerous occasions, reviewed the nature of the crime and the elements of the offense of first degree murder, and he again stated that from the very outset Kibert wanted to plead guilty and thereby avoid a trial and the possible death penalty.

In his written opinion the district judge made the following prefatory observations:

Stated in the abstract, the thrust of petitioner's allegations is almost fantastic. Kibert states that that he believed that in agreeing to take what the court offered him, he was really intending to protect his older brother by serving any sentence that might be levied on Jessee.

Joint App. at 51. The court continued, however:

Stated in light of the circumstances which prevailed on that day and in light of the circumstances that developed subsequently, petitioner's allegations retreat from the verge of the fantastic to become

reasonable, credible and totally consistent.

*Id.* at 51.

We agree with the district judge that the petitioner's allegation that he was offering to go to prison as a surrogate for his brother, Jessee, is indeed "fantastic", but we find nothing in the record to support the court's conclusion that these allegations had "become reasonable, credible and totally consistent". To reach such a conclusion it would be necessary to blindly accept Kibert's 1978 testimony, overlooking the serious discrepancies between the statements made by him in the district court and his prior testimony in 1968, as well as his statements and confession shortly after the crimes. It would further be necessary to discard in its entirety the testimony of Williams relative to his conferences with Kibert and the advice which he had given him. To us it is utterly inconceivable that, as Kibert testified, an experienced attorney such as Williams would discuss these senseless and brutal killings with his client and never mention the charges, the confession, the interview with the newspaper reporter, or the possible punishment that might result upon conviction.

■■■ Upon Kibert's post-conviction challenge of his guilty plea, the state court in 1970 found it was voluntarily entered; the district judge in 1972 reached the same conclusion; and upon our review of the record in 1974 we likewise concluded that Kibert voluntarily and knowingly pled guilty to first degree murder. We find nothing whatever in the 1978 hearing which would require or justify a different conclusion. If anything, the 1978 record raises serious questions concerning Kibert's credibility.[2] The findings of a trial court are, of course, entitled to great weight, but they are never conclusive. "A finding is 'clearly erroneous' when although there is evidence

to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed.2d 746 (1948). We have such a conviction in this case and, accordingly, hold that the district court's conclusion that Kibert's plea was not voluntarily and intelligently entered must be set aside.

■■ The district court also concluded that habeas corpus relief was required because of the failure of the trial judge to question Kibert as to his understanding of his plea. Although the trial court's order states that each brother "fully understood the nature and effect of his plea," there was no evidence presented to indicate the extent of the inquiry, and the district court found that the record in this respect was similar to the silent record in *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). While recognizing that *Boykin* is not retroactive, the district judge held that under the pre-*Boykin* standard in this circuit, although no particular form or ritual was necessary, it must appear that the defendant understood the consequences of his plea. In so holding, the court relied upon our decision in *Bailey v. McDougle,* 392 F.2d 155 (4 Cir. 1968). There is nothing in *Bailey,* however, that conflicts with our holding in *Smith v. Cox,* 435 F.2d 453 (4 Cir. 1970), that the voluntariness of pre-*Boykin* pleas may be determined by the totality of the record as developed in a plenary hearing. Accordingly, even if we assume that the trial judge failed to question Kibert with respect to his plea, such failure did not constitute a valid basis for habeas corpus relief, since the record demonstrates that Kibert entered his guilty plea voluntarily and with a full understanding of the consequences.

---

2. We note, for example, Kibert testified that in making his incriminating statements to the officers at the scene of the crimes, together with his later confession, he was motivated by his desire to protect his brother, Jessee, because of the latter's mental condition. However, the record discloses, and the district judge found,

that Jessee's mental illness, including his pronounced withdrawal and introversion, came on suddenly and did not manifest itself until several days after he had been in jail. This, to us, indicates that Kibert's statements and confession were motivated by something other than his professed solicitude for Jessee.

**526**

■■■■■ As a final ground for habeas corpus relief, the district court concluded that Kibert was deprived of his Sixth Amendment rights by the failure of counsel to raise an insanity defense for Jessee and by the joint representation of the three brothers. In reaching this conclusion the court was influenced to a large degree by our decision in *Kibert v. Peyton,* 383 F.2d 566 (4 Cir. 1967), in which we held that Jessee had been incompetent to stand trial. We find nothing, however, to indicate that Lloyd Kibert was prejudiced in any fashion by his brother's incompetency or the joint representation. The mere fact of joint representation does not per se establish the denial of effective assistance of counsel. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Counsel for Kibert suggests that the trial judge was required to satisfy himself that there was no conflict by virtue of the joint representation, and relies upon the recent decision of the Court in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). In *Holloway,* however, it was the failure of the trial judge to appoint separate counsel or take adequate steps to ascertain whether substantial conflict existed "in the face of the representations [that a conflict existed] made by counsel weeks before trial and again before the jury was empaneled, [that] deprived petitioners of the guarantee of 'assistance of counsel'." *Id.* at 484, 98 S.Ct. at 1179. There is no suggestion of such a conflict in the present case, nor is there anything akin to the circumstances which confronted us in *United States v. Truglio,* 493 F.2d 574 (4 Cir. 1974), or *Sawyer v. Brough,* 358 F.2d 70 (4 Cir. 1966). Perceiving no conflict of interest nor resultant prejudice to Kibert, we must reject the conclusion of the district court that he was denied effective assistance of counsel.

Since we conclude that there were no adequate grounds for habeas corpus relief, the judgment of the district court is reversed and the case remanded with directions to dismiss the petition.

*REVERSED and REMANDED.*