Joseph THOMAS, Petitioner-Appellee,

v.

Dale E. FOLTZ, Respondent-Appellant.

No. 86–1706.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 20, 1987.

Decided May 1, 1987.

Thomas C. Nelson argued, Asst. Atty. Gen., Lansing, Mich., for respondent-appellant.

Elizabeth L. Jacobs argued, Detroit, Mich., for petitioner-appellee.

Before MARTIN and NELSON, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Dale E. Foltz, warden of the state prison in Jackson, Michigan, appeals from the judgment of the district court granting Joseph Thomas' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Appellant challenges the finding made below that the counsel who represented Thomas at a plea proceeding was ineffective because there was an actual conflict of interest which adversely affected the representation of Thomas. For the reasons which follow, we affirm the grant of the writ.

## I.

In 1975, petitioner Thomas and two codefendants, Jeffrey Dorsey and Charles Perkins, were indicted on charges of first degree murder under Mich.Comp.Laws Ann. § 750.316 in connection with the December 6, 1974 shooting deaths of two Detroit residents in their home. On December 6, 1974, Thomas and Perkins were present at Dorsey's house when Thomas observed Dorsey's neighbors leaving their home. Thomas, Dorsey and Perkins then entered the neighbors' home with plans to burglarize it. While they were in the house, the residents returned and were shot to death. The female resident called the police emergency number before she and her husband were shot; thus, the shooting was tape-recorded. There were at least three different volleys within a four minute period, during which the victims were shot at least twenty times by at least four weapons.

After all three defendants were arrested, Perkins' wife hired Charles Campbell to represent Perkins. She did not hire Campbell to represent either of the other two defendants. Campbell subsequently visited Thomas and Dorsey in the Wayne County Jail and showed them news clippings about his prior cases. Dorsey retained Campbell as his counsel and arranged to have a friend pay Campbell. Thomas later also accepted Campbell's representation, al-

though he did not personally retain Campbell. The defendants made no objection concerning the joint representation.

Campbell later stated that it was his practice to bring his press clippings with him to client interviews. Although he did not recall how he came to represent Thomas and Dorsey, Campbell expressly denied having solicited either of them. Nonetheless, Campbell in fact represented all three codefendants.

At the pretrial conference held several weeks prior to jury selection, the assistant prosecutor who handled the case, Ronald Schigur, offered to reduce the charges to second degree murder if each of the defendants agreed to plead guilty. Schigur's policy was to always require that all the defendants accept the plea agreement as a package deal; if any one of the defendants did not plead, none were permitted to enter a plea individually. No action was taken on the plea offer at that time.

Jury selection began on March 12, 1975. During selection, Campbell observed that the jury appeared to be predisposed against the defendants. The case had, in fact, been highly publicized in Detroit.

After the jury was selected, Judge Del Rio, then a judge of the Recorder's Court of Detroit, recessed for lunch. During the recess, Campbell discussed with Judge Del Rio the possibility of all three defendants pleading guilty to the lesser charges of second degree murder. According to Campbell, Judge Del Rio demanded that all three defendants plead; otherwise, none would be permitted to plead. Schigur was not privy to the discussion, since he had left when the court recessed.

Campbell then discussed with the defendants the possibility of entering guilty pleas, and recommended that they do so. Neither Thomas nor the other defendants were ini-

tially willing to plead. In fact, it took Campbell "perhaps an hour ... to encourage them to plead guilty." Campbell acknowledged that he "had to lean on the defendants" much more than usual, but he believed that the defendants had no practical alternative but to plead guilty. He absolutely did not consider making an offer of having one of the defendants, such as Thomas, testify against the other two. According to Campbell, that would have been "grossly unfair," since he was representing all three defendants. Neither Campbell nor Judge Del Rio perceived any potential conflict of interest problems.

According to defendant Dorsey, he was the first to agree to plead guilty; Campbell had convinced him that if he did not plead, he would be found guilty anyway. Dorsey acknowledged that for a time he was the only one to agree to plead and that he attempted to convince the other two defendants to plead as well, since he knew it was a "package" deal. Dorsey remembered Judge Del Rio entering the room where the plea discussions were taking place and instructing him to convince the other defendants to plead guilty. Judge Del Rio purportedly said that the defendants could not escape conviction due to the publicity. Judge Del Rio also stated that although he would be compelled to initially impose harsh sentences as a result of the extensive publicity, he would reconsider the sentences in a few years.[1]

Perkins remembered that he was the next defendant to agree to plead. Based on Campbell's representations, he believed that he and his codefendants could not escape convictions of guilty, whether or not they went to trial.

Thomas was the last to agree to plead guilty. According to Thomas, his decision to plead was based in part on the knowl-

---

**1.** This court expressly acknowledged that Judge Del Rio made this statement in a previous unpublished decision involving an appeal brought by codefendant Perkins. *See Perkins v. Mintzes,* 734 F.2d 15 (6th Cir.1984) (per curiam). In *Perkins,* this court reviewed the district court's denial of Perkins' petition for a writ of habeas corpus. Perkins had sought habeas relief on the ·ground that Judge Del Rio's representation im-

properly induced his guilty plea. This court upheld the denial of Perkins' petition, finding that although Judge Del Rio's remarks were highly improper, they did not deprive Perkins' guilty plea of its voluntary, and therefore constitutional, nature. The issue of ineffective counsel due to a conflict of interest was not before the court.

edge that pleas from all three defendants were necessary for the plea bargain. He also believed that he was forced to enter the plea by Campbell and Judge Del Rio.

When assistant prosecutor Schigur returned at about 2:00 p.m., Campbell announced in open court that all three defendants would plead guilty to second degree murder. Thus, on March 12, 1975, all three defendants entered pleas of guilty in the Detroit Recorder's Court to the reduced charges of second degree murder.

On March 19, 1975, Judge Del Rio held a plea and sentencing hearing at which Campbell explained that he had fully informed the defendants of the nature of their pleas. He further stated that he had explained to the defendants that the critical difference between first and second degree murder under Michigan law is that second degree murder is a parolable offense while first degree murder invokes a mandatory life sentence without parole.

All three defendants also testified at the hearing. Thomas testified that although he was in the house and was carrying a gun when the shootings occurred, he did not shoot anyone.[2] In fact, Thomas claimed that he did not fire a shot. Campbell reiterated this fact in a closing comment to the court. Judge Del Rio subsequently sentenced Thomas to two concurrent terms of forty to one hundred years in prison.

Thomas pursued all possible avenues of appeal, with the Michigan Supreme Court twice denying his petitions for leave to appeal to that court. Thomas thereafter filed, on October 15, 1984, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As grounds for relief, Thomas alleged that he was denied effective assistance of counsel when Campbell represented him and his codefendants at both the guilty plea and sentencing proceedings. Thomas also alleged exhaustion of all available state remedies.

The case was referred to a magistrate who held evidentiary hearings at which de-fense attorney Campbell, defendants Thomas, Perkins, Dorsey, assistant prosecutor Schigur and Judge Del Rio all testified. On March 14, 1986, the magistrate issued an extensive Report and Recommendation recommending that the petition be granted as to Thomas' claim of ineffective assistance of counsel. The magistrate determined that Campbell was ineffective because there was an actual conflict of interest which adversely affected his performance as Thomas' independent counsel. According to the magistrate, the combination of the contingent plea agreement and the multiple representation of all codefendants created the actual conflict. Specifically, the magistrate found that an actual conflict existed because Campbell "may have thought it necessary to put pressure on the more reluctant defendants to obtain the bargain for all of them." The magistrate also believed that the "all or nothing" plea offer may have caused Campbell to forego the possibility of having one defendant plead guilty without the others pleading. With regard to whether the conflict affected Campbell's representation, the magistrate concluded that it had, finding that Campbell's pressuring to obtain a united plea was one of the "substantial reasons" Thomas pled guilty.

After objections were timely submitted, the district court entered an order on July 8, 1986, adopting the magistrate's Report and Recommendation and granting a conditional writ of habeas corpus. The order provided for Thomas' unconditional release from custody if a new trial date was not scheduled within ninety days. Respondent Foltz then brought this timely appeal from the district court's order.

## II.

We must determine whether Thomas was denied effective assistance of counsel due to a conflict of interest, where his attorney jointly represented all the defendants, the defendants were presented with an "all or

---

**2.** In their testimony, Dorsey admitted shooting the woman in the house and Perkins admitted shooting the man.

nothing" plea agreement, and Thomas was reluctant to accept the agreement but was persuaded to do so by counsel.

■■■ The starting point for analyzing a claim of ineffective assistance of counsel is the two-pronged standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Under that standard, a criminal defendant must show both that his counsel's performance was deficient and that it prejudiced his defense in a manner which deprived him of a fair trial. *Meeks v. Bergen,* 749 F.2d 322, 327 (6th Cir.1984). This standard is adjusted, however, when dealing with a situation where a defendant enters a guilty plea instead of being found guilty after a trial. In the context of guilty pleas, the first element, the "performance" aspect, of the *Strickland* test remains the same but the second element, the "prejudice" requirement, changes. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

The instant case involves a specific type of ineffectiveness claim, that of conflict of interest, which is also examined under a slightly different standard from that used in a traditional ineffectiveness claim. The Supreme Court set forth the standard for determining conflict of interest cases in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and summarized it again in *Strickland* as follows:

In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation

of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above [actual or constructive denial of the assistance of counsel altogether]. *Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."*

*Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 (emphasis added) (quoting *Cuyler,* 446 U.S. at 345–50, 100 S.Ct. at 1716–19). This Circuit has interpreted the *Cuyler* test as directing courts "to determine, on the facts of each case, whether there is an actual conflict of interest and whether that conflict has caused ineffective performance in violation of the provisions of the Sixth Amendment...." *Smith v. Bordenkircher,* 671 F.2d 986, 987 (6th Cir.), *cert. denied,* 459 U.S. 848, 103 S.Ct. 107, 74 L.Ed.2d 96 (1982).

■■■ Just as the *Strickland* standard has to be adapted to the guilty plea context, so must the *Cuyler* standard be adapted. The primary question in the guilty plea context is whether the plea was a "voluntary and intelligent choice" made by the defendant. *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). Thus, in order to successfully assert a claim of ineffective counsel based on a conflict of interest, a defendant who entered a guilty plea must establish: (1) that there was an actual conflict of interest, *Smith,* 671 F.2d at 987; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendant.[3] These are the two questions which face this court.

---

**3.** It bears repeating that this second element carries with it a level of presumed prejudice and does not require a showing of prejudice as re-

quired under *Strickland;* it imposes the lesser burden of having to prove some adverse impact.

## A. Actual Conflict

The standard for determining whether an actual conflict of interest exists was set forth in *United States v. Mers*, 701 F.2d 1321 (11th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), as follows:

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." ... There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual significant conflict."

*Id.* at 1328 (citations omitted).[4] The appellant contends that this standard has simply not been met.

■ Joint representation of codefendants does not per se constitute ineffective assistance of counsel due to a conflict of interest. *See Kibert v. Blankenship*, 611 F.2d 520, 526 (4th Cir.1979), *cert. denied*, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980). The Supreme Court has observed, however, that a conflict of interest stemming from multiple representation may prevent an attorney "from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution." *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). Campbell acknowledged that his multiple representation indeed caused him to forego this exact type of potential plea negotiations. He stated that he would not have considered offering one of the defendants, such as Thomas, to testify against the others in exchange for a more favorable plea agreement because that would have been "grossly unfair" under the circumstances.[5]

The Fifth Circuit has stated that foregoing such plea negotiations is proof of an actual conflict of interest. In *Baty v. Balkcom*, 661 F.2d 391 (Former 5th Cir. 1981), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982), an attorney represented both codefendants in the pretrial stage of proceedings during which the state offered a plea agreement. Neither defendant was able to successfully complete a deal, however. The court stated that an actual conflict of interest existed before trial because had the attorney "not been facing a conflict of interest, [he] might have been able to negotiate a plea agreement on [the petitioner's] behalf in return for becoming a prosecution witness against [the codefendant]." *Id.* at 397. This analysis is equally applicable in the present case.

We also find the instant situation analogous to that presented in *Ford v. Ford*, 749 F.2d 681 (11th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 278, 88 L.Ed.2d 243 (1985). In that case, one attorney represented two codefendants, who were brothers. The state was willing to enter into a plea agreement with the brothers but only if both pleaded guilty. One of the brothers wanted to plead guilty while the other wanted to go to trial. On the day of trial, the latter brother changed his mind and both pleaded guilty. In reviewing a habeas petition brought by the brother who had initially desired to go to trial, the Eleventh Circuit found that there was an actual conflict, because it was "obvious that the brothers' attorney was placed in a position of divided loyalties." *Id.* at 682.

■ There was also an actual conflict of interest in the instant case, since there were competing interests at stake which

---

4. In *Dixson v. Quarles*, 627 F.Supp. 50 (E.D. Mich.1985), the district court utilized this standard. On appeal, this court approved the district court's holding and analysis under that standard. *Dixson v. Quarles*, 781 F.2d 534 (6th Cir.1985), *cert. denied*, — U.S. ——, 107 S.Ct. 411, 93 L.Ed.2d 362 (1986).

5. Assistant Prosecutor Schigur testified at the magistrate's evidentiary hearing that he would have considered accepting a plea from a single defendant under those conditions.

attorney Campbell could not pursue due to his joint representation and the "all or nothing" nature of the plea agreement. Because of Campbell's joint representation of all three defendants, he was effectively precluded from engaging in any separate plea negotiations on Thomas' behalf which may have been detrimental to the interests of Dorsey and Perkins. Furthermore, in order to obtain the benefit of the plea agreement for Dorsey and Perkins, Campbell found himself in a position where he needed to place pressure on Thomas to also accept the plea agreement. While we recognize that joint representation does not alone constitute ineffective assistance of counsel due to a conflict of interest, *Kibert,* 611 F.2d at 526, and that it is not necessarily improper for counsel to advise a defendant to plead guilty in a manner consistent with codefendants, *Dukes v. Warden,* 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), we believe that the combination of factors in the instant case created an actual conflict of interest.

### B. Adverse Effect

■ As we recognized above, the existence of an actual conflict will not alone support a finding that Campbell was constitutionally ineffective.[6] In addition, there must be evidence that Campbell's conflict adversely affected the voluntary nature of Thomas' guilty plea. There need not, however, be a showing of prejudice as normally required under *Strickland;* rather, if the defendant is able to demonstrate that a conflict of interest had an adverse impact on the voluntariness of his guilty plea, prejudice will be presumed. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

"[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing...." *Holloway v. Arkansas,* 435 U.S. 475, 490,

98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (emphasis in original). In the instant case, once Dorsey and Perkins informed Campbell that they desired to plead guilty, Campbell was compelled to refrain from advising Thomas not to plead since doing so would have caused the collapse of the plea agreement to the detriment of Dorsey and Perkins. Furthermore, once Campbell obtained the commitments of Dorsey and Perkins, he was compelled to refrain from seeking a separate deal for Thomas by offering Thomas to testify against Dorsey and Perkins. Since an independent counsel would not have had those concerns, we find that Campbell's conflict had an adverse impact on his representation.

Also, in determining that Campbell's conflict had an adverse impact on the voluntariness of Thomas' plea, the magistrate below explicitly found that "one of the substantial reasons [Thomas] pled guilty was because of Campbell's pressure." According to the magistrate, this pressure resulted from Campbell's desire to prevent the plea agreement from collapsing. We find this analysis persuasive and agree that Campbell's actual conflict adversely affected Thomas' decision to plead. In order to protect the interests of Dorsey and Perkins, it was incumbent on Campbell to convince Thomas to plead guilty, even though Thomas was reluctant and was not in the same situation as Dorsey or Perkins. As Thomas testified at sentencing, he did not shoot either of the victims. This testimony was corroborated by both Dorsey and Perkins, who admitted that they alone shot each of the victims. Thus, Thomas may not have shared the same interest in pleading guilty to charges of second degree murder as did Dorsey and Perkins. This was shown by Thomas' reluctance. His reluctance was overcome, however, upon the urging of Campbell to plead along with the other defendants. We find that Campbell's pressure, which was tainted by a conflict of

---

6. *But see Baty v. Balkcom,* 661 F.2d 391, 396–97 (Former 5th Cir.1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982) (holding that habeas petitioner need not demonstrate adverse effect on representation but need only prove an actual conflict to justify habeas

relief on account of a conflict of interest). This holding of *Baty* has since been questioned, however, in light of the Supreme Court's subsequent statements in *Strickland. See Ruffin v. Kemp,* 767 F.2d 748, 751 n. 6 (11th Cir.1985).

interest, had an adverse impact on Thomas' decision to enter a guilty plea.

The appellant strongly contends that Campbell's conflict had no adverse effect because even if Thomas would have been represented by separate counsel, that counsel would also have urged Thomas to plead in light of the state's strong evidence. Thus, the appellant essentially contends that in order to obtain habeas relief, Thomas must establish that but for the conflict of interest, Campbell would not have urged him to plead guilty, and he would not have entered a plea. This argument is unpersuasive because it misstates the burden placed upon Thomas to prove his ineffectiveness claim. The burden of proof required under the appellant's argument would be tantamount to establishing actual prejudice under the traditional *Strickland* test. Such proof is clearly not required. Rather, once an actual conflict is proven, a petitioner need only demonstrate an adverse impact on his counsel's performance, or, in this case, on his decision to enter a guilty plea. *See Ruffin v. Kemp*, 767 F.2d 748, 752 (11th Cir.1985). Since the proper focus is solely on whether Campbell's conflict affected his actions and Thomas' decision, it is inappropriate to consider whether another attorney, untainted by a conflict of interest, would also have recommended that Thomas plead guilty.

We are also unpersuaded by the appellant's reliance on *United States v. Shaughnessy*, 782 F.2d 118 (8th Cir.1986). In that case, defendant Shaughnessy's attorney was hired by two of Shaughnessy's codefendants, who had their own separate counsel. All codefendants pleaded guilty to one of two drug-related charges. Shaughnessy sought habeas relief on the ground that he was denied effective assistance of counsel due to a conflict of interest, but the Eighth Circuit found that there was neither an actual conflict of interest nor an adverse impact. While the court noted the inherent danger which exists when a criminal defendant is represented by counsel retained by a codefendant, it concluded that the danger did not ripen into an actual conflict under the circumstances. The court stressed that Shaughnessy's attorney had "vigorously represented Shaughnessy's interests" in pursuing several avenues which were particularly responsive to Shaughnessy's personal and separate interests apart from his codefendants. *Id.* at 120. The court also expressly rejected Shaughnessy's argument that a conflict of interest was shown because his attorney had advised him to present a united front with his codefendants by rejecting an offer of a reduced sentence. The court found that evidence of such advice by an attorney "is not, without more, proof of an actual conflict of interest." *Id.* The appellant urges that *Shaughnessy* is analogous and supports denial of Thomas' habeas petition.

We disagree. While some of the statements in *Shaughnessy*, standing alone, seem applicable, the case viewed in its entirety is readily distinguishable. Shaughnessy's attorney vigorously represented the individual interests of Shaughnessy, the attorney did not represent all of the codefendants, and there was no proof that the attorney pressured Shaughnessy into accepting a plea bargain which was contingent upon all of the codefendants pleading guilty. All of these facts are in contrast to the present situation, where Campbell was retained not by Thomas but by Dorsey and Perkins, where Campbell represented all of the codefendants, and where Campbell pressured a reluctant Thomas to accept the "all or nothing" plea bargain which Dorsey and Perkins had already stated their desire to accept. We believe that these factors render *Shaughnessy* inapposite and therefore unpersuasive.

In sum, we are of the opinion that Campbell's actual conflict of interest had an adverse impact on his representation and on Thomas' decision to plead guilty. Accordingly, we conclude that under these circumstances Thomas was denied effective assistance of counsel due to Campbell's conflict of interest. We therefore AFFIRM the judgment of the district court granting the writ of habeas corpus.

DAVID A. NELSON, Circuit Judge, dissenting.

Because it does not seem to me that the petitioner has sustained his burden of prov-

ing that an actual conflict of interest adversely affected his lawyer's performance, I must respectfully dissent.

Petitioner's lawyer—who testified that he might have participated in "more than five hundred" criminal matters—was unquestionably an experienced criminal attorney. The heinous crime committed by petitioner and his co-defendants had attracted considerable notoriety (it came to be known as the "911 case" because one of the victims had dialed that emergency number and left the phone off the hook, allowing the killings to be tape recorded by the police), and petitioner's lawyer was less than optimistic after picking the jury. "[T]hey looked at us like we were less than human," he testified, and "I was certain that all three would be convicted of first degree murder if the thing had proceeded to a culmination in front of a jury."

This lawyer's professional ethics may not have been above reproach, but I know of no reason to suppose that his judgment as to the probable outcome of the trial was anything other than informed and accurate.

If the lawyer's potential conflict of interest merely created a hypothetical inhibition to hypothetical plea negotiations, such a conflict cannot justify the very serious step we are asked to take here. Yet the record of this case, as I read it, contains no basis for supposing that another lawyer could have negotiated *any* plea agreement for the petitioner in return for his testifying against his co-defendants, much less a more favorable plea agreement than that actually arrived at when all three defendants elected to plead guilty to charges of murder in the second degree.

At the evidentiary hearing conducted by the magistrate, Assistant Prosecutor Schigur testified that it was his policy, in multiple defendant cases, not to accept guilty pleas from anyone unless all of the defendants pleaded guilty. "The only exception that I ever had," Mr. Schigur said, was that he would sometimes accept a guilty plea from a defendant "against whom I had less evidence," going forward with the trial of the person against whom the evidence was stronger. "But if the one against whom I had the stronger case wanted to plead guilty, leaving me to try the case against the weaker—the person against whom I had less evidence, I would not consider that."

Although the petitioner was carrying a gun when he broke into the victims' house, it is true that he denied having fired any shots, whereas the other defendants admitted to having done so. This does not mean, however, that Mr. Schigur believed he had a stronger case against the co-defendants than he had against the petitioner. On the contrary, Mr. Schigur testified that he felt he had just as strong a case against the petitioner as against co-defendant Dorsey, "but as to Mr. Perkins, who was arrested separately from the other two, and whose preliminary examination was conducted separately from the other two, my case against him, I felt, was substantially *weaker....*" (Emphasis supplied.) This means that Mr. *Perkins* might have had some basis for hoping to be allowed to plead guilty by himself, but nothing in Mr. Schigur's testimony suggests in any way that he would have considered accepting a guilty plea from *petitioner* if Mr. Perkins and the third co-defendant had not pleaded guilty as well.

The deal cut by petitioner's counsel seems to have been an excellent one for all three of the defendants. Petitioner would doubtless have preferred to be acquitted, but that simply wasn't in the cards. I doubt that any competent attorney would have advised petitioner to take his chances on a trial before Judge Del Rio and a jury who looked at the defendants as though they were "less than human."

The inducement for each of the three defendants to plead guilty was a compelling one. As this court said in the case of Defendant Perkins—the defendant against whom the prosecution thought it had the weakest case—

"... the actual inducement behind Perkins' plea was the realization, acknowledged by Perkins' [and petitioner's] trial counsel, that there was a strong likelihood that Perkins and his co-defendants would be convicted of first-degree mur-

der if they continued with their trial. Under Michigan law, a conviction for first-degree murder requires a life-sentence without parole; a conviction for second-degree leaves open the possibility of parole."

*Perkins v. Mintzes*, No. 83–1174 (6th Cir. 1984) [734 F.2d 15 (table) ], slip op. at p. 4.

Possibly in recognition of the fact that petitioner denied actually having pulled the trigger of his gun, Judge Del Rio sentenced petitioner to a lesser term than that received by the other defendants. Petitioner's sentence left open the possibility of parole, moreover, whereas there would have been no possibility of parole if he had been convicted of first degree murder—a denouement that his experienced counsel thought highly likely, absent a guilty plea.

Although the writ of habeas corpus granted in this case is a conditional writ that permits the state of Michigan to schedule a new trial within 90 days, I question how strong a case the state could make at a new trial even if the evidence that existed more than a dozen years ago is capable of resurrection. Michigan abrogated its common law felony murder rule in 1980 (see *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304 (1980)), and the change in the law (a change that operates prospectively only) would seem to make a murder conviction rather less likely today than it was in 1975.

The practical effect of the writ may well be to return the petitioner to the streets, and I see no justification for a federal court doing that on the record before us.