Charles A. PERKINS, Petitioner–
Appellee,

v.

Robert LeCUREUX, Respondent–
Appellant.

No. 94–1594.

United States Court of Appeals,
Sixth Circuit.

Argued March 27, 1995.

Decided June 21, 1995.

David C. Sarnacki (argued), James S. Brady, Theodore R. McNitt, Jr. (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for petitioner-appellee.

Kathleen Davison Hunter, Asst. Atty. Gen. (argued and briefed), Office of the Atty. Gen. Habeas Div., Lansing, MI, for respondent-appellant.

Before: JONES and SILER, Circuit Judges; WISEMAN, District Judge.*

WISEMAN, D.J., delivered the opinion of the court, in which SILER, J., joined.

JONES, J. (pp. 14–16), concurring in the result, delivered a separate concurring opinion.

WISEMAN, District Judge.

Respondent-appellant appeals the grant of habeas corpus to petitioner-appellee. The District Court approved a Report and Recommendation of the Magistrate Judge and ordered the State of Michigan to resentence the petitioner within 90 days or release him from custody. For the reasons which follow, we reverse and remand with instruction to dismiss the petition.

---

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

Facts

The facts of the case are bizarre from a number of standpoints. The petitioner, Charles Perkins, and two codefendants, Joseph Thomas and Jeffrey Dorsey, were convicted on March 19, 1975, of two counts of second-degree murder based on their guilty pleas in the Recorder's Court of Detroit before Judge Del Rio. In the course of a burglary of a house, when interrupted by the return of the owners, petitioner and at least one of the codefendants shot the man and his wife 22 times, killing them both. The case was notorious in the Detroit media at the time, being dubbed the "911 murders" because the woman had apparently dialed 911 before her death and a recording was made of the multiple gun shots over a period of several minutes.

On March 12, 1975, after jury selection had begun, trial counsel for all three codefendants, Charles Campbell, told his clients that there was a strong likelihood of conviction and suggested plea negotiations. Campbell had an ex parte conversation with Judge Del Rio in the hall when the judge told defense counsel that because of the intense media coverage of the case, he would be compelled to impose harsh sentences, but also said he would be willing to reconsider the sentences after three years. There may also have been a second conference in the jury room between the judge, defense lawyer Campbell, and the three defendants without the state's attorney being present. The defendants entered their pleas and at the sentencing hearing the trial judge, again in a bizarre action, invited the defense lawyer and the three codefendants to the bench for an off-the-record discussion without the presence of the state's attorney. Undisputed testimony was that the judge reaffirmed his earlier statements and told the defendants that their sentences would be severe because of the publicity and that they could return in a few years to have him reconsider their sentences.

The prosecutor then on the record urged the judge to impose the maximum sentences in order to protect the community from people who had committed heinous crimes but also as a deterrent to others. The Michigan law permitted sentences of any term of years up to life and the prosecutor asked for sentences of a "minimum of a hundred years in the state prison and I recommend[ed] that the court recommend that they serve every minute of their time." (Joint Appendix at 331) Instead the court imposed a sentence on Perkins of 50 to 100 years and parole was not mentioned.

Judge Del Rio was removed from the bench by the Michigan Supreme Court for reasons unrelated to this case.

Thereafter in 1983, Perkins filed a petition for habeas corpus in the District Court for the Eastern District of Michigan. The District Judge rejected a Recommendation of the Magistrate and denied the writ. The basis of that petition was that the plea was involuntary having been induced by the unfulfillable promise of then judge Del Rio. A panel of this court affirmed the district court in *Perkins v. Mintzes,* 734 F.2d 15, No. 83–1174, (6th Cir.1984)(unpublished). The court said:

Applying these principles here, we do not find that Perkins' decision to plead guilty to second-degree murder rested in any significant degree on Judge Del Rio's promise to reconsider Perkins' sentence in a few years. Although we strongly condemn this type of extra-judicial behavior between a trial judge and defense counsel, we do not believe that the Judge's comments were the primary inducement behind Perkins' willingness to plead guilty. Rather, the actual inducement behind Perkins' plea was the realization, acknowledged by Perkins' trial counsel, that there was a strong likelihood that Perkins and his codefendants would be convicted of first-degree murder if they continued with their trial. Under Michigan law, a conviction for first-degree murder requires a life-sentence without parole; a conviction for second-degree leaves open the possibility of parole. *Richardson v. Hatch,* 134 F.Supp. 110, 111–12 (W.D.Mich.1955).

Furthermore, to the extent that Judge Del Rio's remarks can be characterized as a specific promise which Perkins relied upon, Perkins received the benefit of that promise when Judge Del Rio imposed a fifty- to one hundred-year prison term.

The sentence imposed leaves open the possibility of parole for Perkins at a later date. Judge Del Rio could have sentenced Perkins to a life term, *see People v. Van Epps*, 59 Mich.App. 277, 229 N.W.2d 414 (1975), but chose not to exercise his discretion in this manner. Unlike the situation in *Machibroda*, Perkins was not given a specific promise that his sentence would run no longer than a defined number of years. Perkins was only told that the Judge would be willing to reconsider his sentence in a few years. Thus, Perkins received the implied benefit of Judge Del Rio's promise, namely, a prison sentence that left open the possibility that Perkins could be released at a later date.

Thereafter Perkins' codefendant, Thomas, filed a petition for the writ of habeas corpus in the Eastern District of Michigan on October 15, 1984, alleging denial of effective assistance of counsel because Campbell had represented all three codefendants. The Magistrate held an evidentiary hearing at which defense attorney Campbell, all three codefendants, prosecutor Schigur and ex-judge Del Rio testified. The Magistrate's recommendation for issuance of the writ was adopted by the District Judge and the respondent appealed to this court. A divided panel of the court found an actual conflict of interest and affirmed the decision of the district judge granting the writ unless a new trial was scheduled within 90 days. *Thomas v. Foltz*, 818 F.2d 476 (6th Cir.1987).

As part of the proof on the *Thomas* petition, in the examination of ex-judge Del Rio, on November 4, 1985, after his examination and cross-examination were completed, the following colloquy took place between the Magistrate and Mr. Del Rio:

BY THE COURT:

Q. Just one further question, Judge. Would it be unusual, particularly, in view of the fact that your memory about certain things not contained in the transcript could be vague, and understandably so, would it be unusual to require a, what you might term a package deal where there are multi-defendants and plea negotiations?

A. No, your Honor, the reason, the reason being that if you've got a clear docket, it's so much easier to handle a case. And secondly, when I sentenced these particular individuals, and after reading the presentence report, I felt that they—that this sort of thing, particularly in the center city, was going to continue.

I did not discuss this particular case with Judge Heading, but I knew that at other times when we had conversations, before and after the bench meetings, that he as well as myself had made up our minds that depending upon the particular crime and the circumstances of it, we were going to send a message back to the black community to stop this kind of senseless killing in connection with robberies. And that is one of the considerations I took when I sentenced these particular individuals under the circumstances of this robbery and this killing.

(*See* Testimony of Judge Del Rio, Transcript of Evidentiary Hearing on Nov. 4, 1985, at 26, Exhibit "A" to Petitioner's Response to Respondent's Motion to Stay Order)

Mr. Del Rio's answer was unresponsive to the question by the Magistrate and represented a purported revelation of his thought processes delivered ten and one-half years after the fact.

Some six years later, on May 30, 1991, Perkins filed this second petition for the writ of habeas corpus in the Western District of Michigan alleging as grounds therefor a denial of equal protection of the laws because of an impermissible consideration of race in his sentencing by then-judge Del Rio. He cited as evidence thereof the remarks of Del Rio quoted above.

The Magistrate Judge appointed counsel for petitioner and later granted a motion to expand the record to include a transcript of the evidentiary hearing held in *Thomas v. Foltz*, No. 84-4740, which contained the remarks of Del Rio. (*See* exhibit "A" of Petitioner's Response to Respondent's Motion to Stay Order) No appeal was taken from the non-dispositive order of the Magistrate Judge allowing expansion of the record.

The Magistrate Judge then submitted a Report and Recommendation to the District Judge in which he found cause and prejudice

for petitioner's failure to raise the present issue in his earlier petition since Perkins did not learn of Del Rio's statement until after his earlier petition had been denied. The Magistrate Judge then went on to find that "it is obvious" that his sentence was harsher than it would have been had he been white, that the judge's testimony represents direct evidence of "purposeful discrimination" against Perkins because he is African American, that his sentence was the result of invidious discrimination on account of race, and that resentencing should be ordered.

The district court adopted the Report and Recommendation and ordered issuance of the writ unless the defendant was resentenced within 90 days. The respondent objected to the Magistrate's reliance on the testimony of Judge Del Rio. This objection was rejected by the district court on the ground that no appeal was taken from the Magistrate Judge's order allowing for the expansion of the record to include the transcript of the Thomas habeas corpus hearing. From this order the respondent appeals, assigning four errors.

I. Whether the District Court improperly denied review of respondent's substantive objections to the Magistrate Judge's Report and Recommendation.

II. Whether the factual findings of the state court and prior habeas corpus court are entitled to the presumption of correctness.

III. Whether petitioner's second petition for writ of habeas corpus is barred by the abuse of the writ doctrine.

IV. Whether the District Court improperly based issuance of the writ of habeas corpus on incompetent evidence.

Assignments I, II, and IV are all related to the statement of Judge Del Rio in the *Thomas* hearings. They will be treated together in the later portion of this opinion. We first address Assignment III and the asserted abuse of the writ.

### Abuse of the Writ

■ Rule 9(b), Rules Governing Section 2254 Cases, requires dismissal of second or successive petitions for the writ if the judge finds that failure to assert newly alleged grounds in the previous petition constitutes abuse of the writ. Application of this rule requires an analysis of "cause and prejudice" similar to that required in state procedural default cases. *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 1469–70, 113 L.Ed.2d 517 (1991). The cause issue seems clearly to exist here because the statement of Judge Del Rio was not made until after Perkins' earlier petition had been dismissed on appeal.

■ The second prong of the cause and prejudice test is more problematic. On the sole basis of the statement of Mr. Del Rio ten years after the fact, the Magistrate Judge found that "it is obvious that petitioner's sentence was harsher than it would have been had petitioner been white." (Joint Appendix at 243) The finding was based on written transcript of prior testimony so there was no credibility determination. We therefore review the finding de novo.

Contrary to the "obviousness" of discriminatory animus on the part of Judge Del Rio are a number of other facts bearing on this question. First, Judge Del Rio, the defendants, the victims, the prosecutor, and defense counsel Campbell were all African-American. There was no suggestion of any racial bias in any of the previous proceedings. At the very least, this casts doubt on the existence of an anti-black animus. Second, at the time of the sentencing, the undisputed testimony of the judge, the defendants and their lawyer Campbell is that the sentence was going to be harsh because of the intense publicity the case had received. The defendants and their lawyer were fearful of a guilty verdict for first-degree murder which would require a sentence of life without parole and they were aware of this difference in arriving at the decision to plead to second-degree murder. This finding of fact was made by the court in both the *Perkins* and *Thomas* prior petitions. Third, the testimony of defense counsel, Campbell, on the judge's thought processes at the time of sentencing is relevant:

Q. Now, it's your recollection today in 1982 that you can only recall this one

conversation with Judge Del Rio, is that correct?

A. Well, I do also vaguely recall that he called the guys up to the bench, and I was reminded of this by reading the sentence transcript, and this in itself was unusual, to call the defendants up to the bench in my presence with no prosecutor there, and then I believe he just more or less reaffirmed what he said later, "I've got to be tough on you guys now but in a few years come back and see me," something like that.

Q. This bench conference was at the time of sentencing, or before—the day of sentencing but immediately prior to the time of sentencing, is that correct, sir?

A. I don't recall whether it was before or after.

Q. All right.

A. I think that the transcript says it was before and I have no reason to dispute it.

Q. All right.

A. In other words, the point being, really, not that we were trying to do anything underhanded but more that the public would not understand that he had treated these three young fellows with love and understanding and consideration because the crime was very brutal, there were racist overtones to the situation which would seem to mitigate the behavior; moreover, I think that Mr. Perkins was the least culpable, as I recall, and, in other words, I was trying to do my best for them and I was trying to get the Judge to understand that these kids were, you know—should be treated with understanding, and then he was saying more or less, "I can't right now but I will in a few years, perhaps."

Q. Prior to today's date there has been testimony in this cause by Charles Perkins and the two other defendants specifically to a meeting prior to the entries of the pleas, ostensibly present at the meeting were yourself, the assistant prosecuting attorney assigned to this case, Ronald Schigur, the three defendants, and Judge Del Rio, in the jury room. It is your testimony, sir, that you do not recall such a meeting or that it's perhaps possible that such a meeting occurred?

A. I would think that—well, the Judge was accustomed to conducting a lot of talk in the jury room at times, but I would not think that Mr. Schigur was there because I don't recall Mr. Schigur being privy to the discussions about the Judge easing up in the years ahead.

Q. All right.

A. And if anything was said to the accuseds by the Judge I don't believe Mr. Schigur was there, but then again he may have been. I'm just basing that on my understanding of how the Judge's courtroom operated and my fairly clear recollection that Mr. Schigur would have been a fly in the ointment, he would have just been there confusing the issue by trumpeting the horrible facts.

(Joint Appendix at 316–319.)

Further, the judge imposed a lighter sentence by one-half than the prosecutor recommended. Prosecutor Schigur asked for one hundred years and a recommendation "that they serve every minute of their time." (Joint Appendix at 331.) Instead, Perkins was sentenced to a minimum of 50 years and parole was possible.

A petitioner attacking a conviction "must shoulder the burden of showing not merely ... a *possibility* of prejudice, but that [errors] worked to his *actual* and substantial disadvantage ..." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original). In a cause and prejudice analysis of a procedural default case, this court recently relied on the quoted portion of *Frady* and added: "Accordingly, the prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." *Rust v. Zent,* 17 F.3d 155, 161–162 (6th Cir.1994). Here there is strong evidence from the codefendants' own mouths of two egregious and brutal murders. The evidence would have supported a first-degree conviction, and Perkins received only half the sentence requested by the prosecution. The evidence of the prejudice prong in this situation is certainly less than "obvious."

**220**

The finding of the Magistrate Judge, approved and adopted by the District Judge, in this regard is error.

### The Statement of Judge Del Rio

█ There is a far more important principle at stake in this case. The District Court's decision to disturb this 20–year–old conviction is based entirely on a statement made by the sentencing judge ten years after the fact, regarding his thought processes at the time of sentencing. This type of evidence must not be considered.

█ It is a cardinal principle of Anglo–American jurisprudence that a court speaks only through its minutes. Ninety-one years ago the Supreme Court announced the rule that testimony of the mental processes of a judge was not to be considered:

> [T]he testimony of the trial judge given six years after the case has been disposed of, in respect to matters he considered and passed upon, was obviously incompetent ... *A judgment is a solemn record. Parties have a right to rely on it. It should not lightly be disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision.*

*Fayerweather v. Ritch,* 195 U.S. 276, 306–07, 25 S.Ct. 58, 67, 49 L.Ed. 193 (1904) (emphasis added).

The *Fayerweather* rule is still good law. The Eleventh Circuit relied upon it in 1982 in holding that a district court should not have considered a trial judge's post-decision statements concerning the influence various facts had on his decision. *"Such post-decision statements by a judge or juror about his mental processes in reaching decision may not be used as evidence in a subsequent challenge to the decision."* *Proffitt v. Wainwright,* 685 F.2d 1227, 1255 (11th Cir.1982) (emphasis added). The Fifth Circuit, in similarly adamantine language, said:

> A judge's statement of his mental processes is absolutely unreviewable. The court has no means of observing mental process ... The trial judge's statement of his mental process is so impervious to attack that even if he were to come forward today and

declare his memorandum misstated his reasons for the mistrial, we could not consider his explanation.

*United States v. Crouch,* 566 F.2d 1311, 1316 (1978).

Again, in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) in an en banc reversal of a district court death penalty habeas corpus decision, the Fifth Circuit held:

> We decide, however, that the portion of Judge Fuller's testimony in which he explained his reasons for imposing the death sentence and his probable response to the evidence adduced at the habeas hearing is inadmissible evidence that may not be considered by the district court.
>
> It is a firmly established rule in our jurisprudence that a judge may not be asked to testify about his mental processes in reaching a judicial decision.

*Id.,* at 1263.

In rejecting the state's request to call the trial judge to testify about whether certain evidence did or did not prejudice the result in a non-jury trial, Judge Stevens of the District of New Jersey cogently explained the policy reasons why such testimony is never admitted:

> First, such testimony is inherently suspect. The risk of inaccuracy, in the opinion of this Court, outweighs any probative value such evidence might have. "The testimony is often given several years after the fact and a judge is unlikely to be able to reconstruct his thought processes accurately over such a span of time." *Washington v. Strickland, supra* at 1263.
>
> Moreover, the fact that the state trial judge might be *willing* to testify is irrelevant to this consideration. Our concern with the accuracy and probative value of the testimony remains the same, irrespective of whether the testimony is voluntarily or involuntarily provided. Moreover, this Court is satisfied that if such testimony were admitted, the line between voluntariness and involuntariness would quickly become blurred. A petitioner against whom such evidence were introduced should, arguably, be entitled to cross-examination and discovery. Concerns with judicial immunity, comity, and independence would

thus arise regardless of the circumstances which might have brought the testimony of the trier of fact into court.

Finally, this Court is of the opinion that such an inquiry is prohibited by general consideration of judicial finality. When a verdict is rendered, neither the judge nor the jury is asked for justifications. The decision may be reviewed and reversed, modified or amended. However, the trier of fact is not to be placed on the witness stand and cross examined as to the reasons for the outcome, absent evidence of improprieties in the decision making process itself. If a judge seeks to give reasons for a decision, we are wiser for what is said on the record. However, once a judicial opinion is written and filed, we are all as expert in its interpretation as the hand that wrote it. It belongs to us all.

*Morrison v. Kimmelman,* 650 F.Supp. 801, 807 (D.N.J.1986).

### Preservation of the Issue

The district judge refused to consider the admissibility or competency of the testimony of Judge Del Rio on the ground that respondent did not appeal from the Magistrate Judge's order allowing expansion of the record. Even if respondent could have appealed at this point, there is a marked difference between the expansion of the record and the subsequent interpretation of portions of that expanded record and dispositive reliance on such portions. To the interpretation and reliance respondent did timely object and the district court erred in refusing to consider such objections. In any event, in view of the clearly established precedent cited above and the cogent policy reasons therefor, we hold that it was plain error to consider and rely upon the testimony of Del Rio as to his thought processes in sentencing the petitioner.

NATHANIEL R. JONES, Circuit Judge, concurring.

While I concur in the conclusion reached by the majority, I write separately to explain that there is another important principle at stake in this case—the constitutional right to equal protection of the laws. The majority opinion emphasizes that it is an historical rule that a judge may not impeach his or her judicial determinations. Nevertheless, this rule of judicial finality must not be construed as always precluding relief from a claim brought under the Equal Protection Clause of the Fourteenth Amendment.

In the instant case, Judge Del Rio's statement, when considered in its full context, does not evidence a clear equal protection violation warranting habeas corpus relief. Still, I believe that there could well be a case where a judge testified post-decision and it was so clear that the Equal Protection Clause had been violated that justice would demand acknowledging the judge's testimony and reversing the judge's discriminatory action.

Respondent LeCureux argued that cases addressing Federal Rule of Evidence 606(b) [1] were irrelevant to the instant case because the rule applies only to jurors. I find, however, that cases addressing Rule 606(b) illuminate the care with which the clash of principles at issue in the instant case must be examined. For instance, in *Shillcutt v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1987) the Seventh Circuit held that a juror's post-verdict testimony of an alleged racial slur made by another juror during deliberations could not be used to impeach the jury verdict, pursuant to Federal Rule of Evidence 606(b).

---

1. Rule 606(b) states the following:

   **Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
   Fed.R.Evid. 606(b).

In so ruling, however, the court noted the following:

> The rule of juror incompetency cannot be applied in such an unfair manner as to deny due process. Thus, further review may be necessary in the occasional case in order to discover the extremely rare abuse that could exist even after the court has applied the rule and determined the evidence incompetent. In short, although our scope of review is narrow at this stage, we must consider whether prejudice pervaded the jury room, whether there is a substantial probability that the alleged racial slur made a difference in the outcome of the trial.

*Id.* Similarly, the following statement discussing the courts' application of Rule 606(b) to allegations of juror bias is instructive:

> Evidentiary rules that insulate from discovery the violation of constitutional rights may themselves violate those rights.
>
> .... As a consequence of this collision of constitutional principles, blanket rules either excluding all juror testimony of bias or admitting all such testimony are inappropriate. A balance must be struck, protecting parties from the most egregious cases of jury bias while leaving the jury free to decide most cases without fear of judicial intrusion. While lines may be difficult to draw in many cases, it should be clear that among the most serious cases of jury bias are those involving racial prejudice. Eradication of the evil of state supported racial prejudice is at the heart of the Fourteenth Amendment. This suggests that the constitutional interests of the affected party are at their strongest when the jury allegedly employs such bias. The operation of racial prejudice undermines the jury's ability to perform the role of preventing governmental oppression and, in fact, converts the jury itself into an instrument of that oppression. This also suggests that the policy interests behind the enforcement of Rule 606(b) are at their weakest in such a case.

27 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure* § 6074 (1990) (footnotes omitted); *see also Dobbs v. Zant,* 720 F.Supp. 1566, 1571–74 (N.D.Ga.

1989), *aff'd,* 963 F.2d 1403 (11th Cir.1991), *rev'd on other grounds,* — U.S. —, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993).

In contrast to the Fifth Circuit's statement in *United States v. Crouch,* I do not believe that "[t]he trial judge's statement of his mental process is so impervious to attack that even if he were to come forward today and declare that his memorandum misstated his reasons for the mistrial, we could not consider his explanation." 566 F.2d 1311, 1316 (5th Cir.1978). Instead, in cases where a strong rule and a constitutional principle stand at odds, this court must not blindly enforce the rule, but must examine the competing interests at issue and seek to find the appropriate balance between them. We fail to properly use the scales of justice if we do otherwise.