**Mitchell W. CODDINGTON, Petitioner–Appellee,**

v.

**Sally LANGLEY, Respondent–Appellant,**

No. 02–1490.

United States Court of Appeals, Sixth Circuit.

Oct. 9, 2003.

Before: NELSON, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

In this habeas corpus case, Mitchell W. Coddington claims that he received ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments. The district court agreed and granted Coddington's petition. As we disagree with that conclusion, we REVERSE.

## I.

### A.

On July 13, 1992, Mitchell Coddington pleaded no contest to one count of first degree Criminal Sexual Conduct (CSC) and two counts of second degree CSC under Mich. Comp. Laws §§ 750.520b-.520c (1991). The alleged victim was his three-year-old daughter. At sentencing Coddington filed a motion to withdraw his plea, which the court granted. He subsequently stood trial on all charges, but the jury failed to reach a verdict.

On October 15, 1993, before the commencement of a second trial, Coddington entered into another plea agreement with the government. Under this agreement, Coddington pleaded guilty to five counts of second degree CSC in return for the government's dismissal of the first degree CSC counts, which carried the possibility of a life sentence.

During the hearing scheduled to ensure Coddington's acceptance of the plea agreement was voluntary, the state trial judge had some difficulty establishing a factual basis for Coddington's plea. A functionally illiterate man with documented cognitive disabilities, Coddington had trouble answering several questions designed to establish a factual predicate for the plea. JA 203, 344. Second Degree CSC requires proof that the defendant engaged in "sexual contact" with a person under thirteen years of age, Mich. Comp. Laws § 750.520c(1991), and is defined as any intentional touching of the victim's intimate parts for the purposes of sexual arousal or gratification, *id.* at § 750.520a.

During questioning by the court, Coddington initially said he touched "her private parts," but when asked if he touched her vaginal area, Coddington said "no." JA 350–51. When asked where he touched her, Coddington failed to answer. JA 351. He answered "yes" when asked if he deliberately touched the victim, but was unresponsive when asked why. JA 353. Later, he answered "yes" when asked if he touched the victim in a "sexual fashion," then denied touching her for "sexual gratification." JA 250, 352.

Adding to the confusion, Coddington faced considerable pressure from his mother and trial counsel to accept the plea. During the hearing, the trial court called two recesses to allow Coddington to confer with his attorney, Charles Novelli, and his mother, Mary Coddington. In each recess, Novelli and Coddington's mother tried to persuade him to answer the questions fully so that the judge could accept his plea. His mother encouraged him to cooperate and take a lesser sentence because Coddington's brother had received a 25–50 year sentence after he proceeded to trial on similar charges. JA 178. In the past, Coddington had relied heavily on his mother's advice, and because she had suffered a heart attack during his first trial, he did not want to risk her health by subjecting her to a second trial. JA 181. Novelli tried to be even more persuasive. He was angry, raised his voice in trying to intimidate Coddington, and made Coddington feel "forced and coerced" into pleading guilty. JA 180–81.

After the final recess and after the final meeting with his counsel and mother, Coddington answered "yes" when asked if his contact with the victim was a "sexual touch." JA 356. In response, the court "somewhat reluctantly" accepted his guilty plea and set a date for sentencing. JA 358. Coddington attempted to withdraw his guilty plea at sentencing, but the trial judge refused and sentenced him to prison for 5–15 years. JA 364–66.

### B.

The State of Michigan appointed Jennifer A. Pilette to assist Coddington on appeal. At the time, Pilette had fifteen years of experience, nine of them with the State Appellate Defender's Office, and had litigated over 500 criminal appeals. JA 276–77. After reviewing the lower court file, Pilette visited Coddington at the Hiawatha Regional Correctional Facility to discuss his appellate options on February 17, 1994. JA 278.

During this meeting, Pilette counseled Coddington on his options for appeal. Her notes from the meeting reveal that they "[t]alked at length of plea withdrawal, [but did] not want risk of CSC 1." JA 281. In other words, if Coddington were to challenge his guilty plea successfully, he likely would go to trial on first degree CSC charges with the potential of receiving a life sentence. JA 282. Pilette's notes also indicate that she told Coddington that the trial judge had erroneously calculated Coddington's prison term and explained that this would be a strong issue on appeal. JA 281–82.

Pilette also reviewed the transcript of Coddington's plea hearing. JA 290. Her notes indicate that she recognized the existence of an appealable issue regarding the propriety–specifically the voluntariness–of the plea. During their meeting, Coddington told Pilette about the abusive behavior of his trial counsel at the plea hearing. JA 186. "I would have raised the [plea] issue on appeal," Pilette later explained; "[i]t was [Coddington's] decision based on the risk as reflected in my notes." JA 300.

After their meeting, Pilette filed an appeal and a motion to remand in the Michigan Court of Appeals that addressed only the resentencing issue. The court granted

the motion, and the trial court on remand reduced Coddington's sentence to 3–15 years. At no time did Pilette appeal the voluntariness of Coddington's plea.

After the trial court resentenced Coddington, the original appeal remained pending in the Michigan Court of Appeals. Having prevailed on the only issue raised in the appeal, Pilette sought Coddington's permission to withdraw the appeal. She sent him a proposed affidavit to that effect in prison, but she never received a response. By that time in his prison stay, Coddington no longer permitted anyone in the prison to read his mail because he feared that others would learn about the molestation of his daughter. JA 289. As an alternative, he instructed Pilette to send correspondence to his sister, who could then communicate with him. Pilette complied, but Coddington's sister soon moved and left no forwarding address. *Id.*

Frustrated in her efforts to receive a written confirmation from Coddington expressing his desire to withdraw the appeal, Pilette filed a Motion for Guidance with the Michigan Court of Appeals on September 29, 1994. JA 86. In her motion, Pilette stated that she had met with Coddington earlier and that he had agreed not to challenge his conviction or sentence in any other respect than the one upon which relief had been granted. *Id.* In response to this pleading, the Michigan Court of Appeals dismissed Coddington's appeal on November 8, 1994. JA 85.

### C.

When Coddington entered his guilty plea in 1993 and when he met with Pilette in 1994, the Michigan Parole Board generally granted parole to sex offenders once they had served their minimum sentences. After Coddington's resentencing, however, Michigan's parole practices changed. The new policy showed a preference for keeping sex offenders in prison for their full sentences.

Consistent with this new policy, the board denied Coddington's parole application after he had served three years. JA 183. Soon thereafter, on June 27, 1997, Coddington filed a *pro se* petition seeking relief from judgment in Michigan state court. JA 107. In his petition, Coddington raised five federal and state-law grounds for relief: (1) abuse of process, (2) failure to establish a factual basis for his guilty plea, (3) undue influence from the trial judge and defense counsel in coercing the guilty plea, (4) failure of the trial court to allow a withdrawal of the guilty plea, and (5) ineffective assistance of trial and appellate counsel. JA 13–17. The court denied Coddington's petition. The Michigan Court of Appeals and the Supreme Court of Michigan refused to hear his claims because he had failed to raise them in his prior appeal. *See* Mich. Ct. R. 6.508(D).

On February 2, 1999, Coddington filed this federal habeas corpus petition, raising the same grounds for relief he had raised in his state petition for relief from judgment. On January 10 and February 15, 2002, the district court held an evidentiary hearing regarding the petition.

During the hearing, Pilette admitted that she had no independent recollection of her initial meeting with Coddington eight years earlier. Relying on her notes from the meeting to refresh her memory, she stated that (according to the notes) they "[t]alked at length of plea withdrawal, not want risk of CSC 1." JA 281. In her view, the notes confirmed that she discussed the voluntariness of Coddington's plea with him, and that he decided that going to trial on the first degree CSC charges (and possibly receiving a life sentence) was too great a risk to warrant an appeal on the issue. JA 300. Although Pilette would

have appealed the guilty plea, she confirmed that the decision was Coddington's alone. JA 300.

During the hearing, Coddington also testified about his recollection of the meeting with Pilette. The following passage represents Coddington's full recollection of the meeting:

> I told her about the attorney threatening me out in the hall a couple times. And she said there's nothing—we'll see, we'll look into it. Because what I really want to go with, I've got something that I seen in your transcripts or whatever. I'm going to go with a time cut, blah-blah-blah.
>
> I thought she was going after the attorney also. Okay. But she didn't. She went and got a time cut. So, there was a misunderstanding.
>
> I didn't have the transcripts until after I had got in the courtroom. Okay. What she filed—I was blinded, okay, by what she had filed. I was dumbfounded. She only filed for a time cut and not acting as my attorney like I wanted her to be. Because he threatened to beat me up, whatever, okay, verbal abuse, you could call it. And that's exactly what I told her.

JA 186. Coddington produced no additional evidence, written or otherwise, to substantiate his recollection of the meeting.

Also before the district court was Pilette's Motion for Guidance filed with the Michigan Court of Appeals in 1994. In this pleading, Pilette stated, among other things: "On the date of resentencing counsel discussed with the Defendant that they had prevailed on the only issue raised on appeal and Defendant agreed to dismiss his appeal as of right, given a favorable resentencing." JA 87.

In reviewing the habeas petition, the district court first determined that Pilette's performance violated Coddington's right to effective appellate counsel under the Sixth and Fourteenth Amendments. Concluding that Coddington likely would have prevailed had he challenged the voluntariness of his plea, the court also determined that Coddington was prejudiced by Pilette's ineffective assistance. The district court accordingly granted the petition.

## II.

The parties share common ground with respect to the standard of review that applies to Coddington's claim. When a habeas petitioner procedurally defaults a federal claim in state court, the federal courts as a rule generally will not review the petition. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir.1999). Coddington in this instance failed to challenge the voluntariness of his plea on direct appeal, which under Michigan law barred him from raising the issue later. *See* Mich. Ct. R. 6.508(D); *see generally People v. Jackson,* 465 Mich. 390, 633 N.W.2d 825 (2001).

Most rules have exceptions, however, and that includes this one. When "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," the federal courts will consider a federal claim raised under 28 U.S.C. § 2254. *Coleman,* 501 U.S. at 750; *see Lancaster v. Adams,* 324 F.3d 423, 436 (6th Cir.2003). An inmate may show "cause" for a default by pointing to an explanation beyond the prisoner's control, such as ineffective assistance of counsel. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *see also Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1984) (holding

that defendants are entitled to effective assistance of appellate counsel on their first appeal as of right). An inmate may show "prejudice" arising from a default by showing that the error actually and substantially disadvantaged his state-court case. *See Perkins v. LeCureux,* 58 F.3d 214, 219 (6th Cir.1995). Coddington thus may obtain habeas relief if he (1) can show that Pilette's appellate assistance was constitutionally ineffective and caused his procedural default and (2) can show that these errors prejudiced his state-court appeal.

The cause and prejudice determinations of the district court receive *de novo* review. *See Groseclose v. Bell,* 130 F.3d 1161, 1163 (6th Cir.1997). Any factual findings underlying those conclusions receive clear-error review. *Id.*

The parties further agree that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, § 104(d), 110 Stat. 1214, 1219 (codified at 28 U.S.C. § 2254(d)), does not alter these standards. As we recently concluded in *Maples,* AEDPA applies only to those cases "adjudicated on the merits in State court." *See Maples v. Stegall,* 340 F.3d 433, 436–37 (6th Cir.2003) (refusing to apply AEDPA to a procedurally defaulted motion for relief from judgment in state court); 28 U.S.C. § 2254(d) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings...."). Because the Michigan courts never adjudicated Coddington's federal claims on the merits in view of his procedural default, AEDPA does not apply.

### III.

 What divides the parties is whether Coddington established cause for his procedural default. No one contests that he had a compelling claim–the voluntariness of his plea–to raise on appeal. And no one contests that he was told by his appellate counsel that the claim was a strong one. The critical issue is whether Coddington expressly instructed Pilette to raise the issue and she chose not to follow his instructions.

The district court concluded that Pilette provided ineffective assistance of appellate counsel in four ways. One, Pilette appeared to ignore Coddington's wish to appeal the voluntariness of his plea. Dist. Ct. Op. at 27; JA 134. Two, to the extent doubt exists about Coddington's directions to Pilette, the absence of a written record must be construed against Pilette. Dist. Ct. Op. at 25–26; JA 132–34. Three, Pilette failed to ensure that Coddington understood she was dismissing his appeal once he received relief on the resentencing issue. Dist. Ct. Op. at 26; JA 133. Four, Pilette failed to explain to Coddington that Michigan's parole policy could change in the future. Dist. Ct. Op. at 28; JA 135. Whether looked at together or apart, these explanations do not support the granting of the writ.

### A.

Coddington's most compelling position would seem to be that he expressly told Pilette to challenge the voluntariness of his plea on appeal, and she did not. But the argument is not supported by the district court's decision or by the record from the habeas hearing.

The district court's 41–page opinion, as an initial matter, never directly answers this factual question: Namely, did Coddington expressly instruct Pilette to appeal the voluntariness issue in spite of the risk of a life sentence and the burden of a second trial? The closest the district court comes to making such a finding is the following sentence: "By not raising the

coercion evident from the record, counsel ratified trial counsel's abusive actions and ignored her client's wishes." Dist. Ct. Op. at 27; JA 134. The "ignored her client's wishes" reference, however, is an oblique one because it comes at the end of a paragraph that discusses only specific instances in which *trial* counsel failed to adhere to Coddington's wishes and because it never says Coddington specifically instructed his appellate counsel (Pilette) to appeal the issue. That trial counsel allegedly failed to follow Coddington's wishes merely confirms that Coddington had a strong issue to appeal. In the absence of a directive from Coddington to Pilette to appeal his plea, however, we are left with a situation in which Coddington conveyed at most an ambiguous interest in altering his sentence but not "express instructions" regarding the appeal. *See Roe v. Flores–Ortega*, 528 U.S. 470, 478, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's *express instructions* with respect to an appeal.") (emphasis added); *see also Regalado v. United States*, 334 F.3d 520, 525–26 (6th Cir.2003) (attorney's performance not deficient when client expressed a desire to appeal, but did not expressly instruct her attorney to do so).

Even if we construed this passing reference as a finding of fact that Coddington did expressly instruct Pilette to appeal the issue, moreover, the record would not support the finding. Despite having a full opportunity to testify about his meetings with Pilette during the habeas hearing, Coddington never said that he instructed her to appeal his guilty plea. At oral argument, Coddington's counsel identified the following passage from the evidentiary hearing as the best indication of Coddington's instructions to Pilette:

Q: Did you tell [Pilette] you were not guilty?

A: Yes.

Q: Did you tell her you had been forced to plead guilty?

A. Yes. I told her my attorney had threatened me. She was supposed to file some stuff and she didn't. She only filed for a time reduction.

JA 183. The pertinent question is not asked here and apparently never was asked. That Coddington volunteers that "[s]he was supposed to file some stuff and she didn't" hardly establishes that he expressly instructed her to appeal the voluntariness issue.

Later, on cross-examination at the evidentiary hearing, Coddington testified further about his initial meeting with Pilette. Although he acknowledged talking about his guilty plea and the improperly calculated sentence, he again failed to state that he expressly instructed Pilette to appeal his plea. Coddington at most testified that "there was a misunderstanding," not an instruction by him to appeal that Pilette chose to ignore. JA 186.

Pilette's testimony does not help Coddington either. While she understandably said that she could not remember the details of a meeting held eight years earlier, she did provide her contemporaneous notes of the meeting and her Motion for Guidance. Both sources indicated to her that Coddington affirmatively made the choice not to appeal the voluntariness issue. Under these circumstances and on this record, a finder of fact could not conclude that Coddington affirmatively directed Pilette to file an appeal on this issue and she refused to do so.

One might fairly wonder whether this review of the record asks too much of Coddington, a man of limited mental acuity who by all accounts received considerable

pressure from his *trial* counsel to enter this guilty plea. Yet the questions at hand–how long would he stay in prison under the plea and how long could he stay in prison after a second trial?–were well within his grasp. He could fairly be expected to testify, if true, that he directed Pilette to appeal the voluntariness issue. After all, he had no trouble appreciating the significance of the Michigan Parole Board's decision to deny him parole after he had served the minimum sentence–three years. Soon after that decision, he filed this habeas petition seeking to undo the guilty plea.

### B.

Nor could the district court fill this gap in the record by "constru[ing] the failure to make a written record against appellate counsel." Dist. Ct. Op. at 26; JA 133. The district court did not cite any cases in support of this view. Nor has Coddington's counsel done so on appeal. Quite to the contrary and to his credit, he candidly acknowledges that no case law supports the requirement of a written waiver. Br. for Appellee at 48. And Supreme Court precedent regarding the standard for effective assistance of counsel has long resisted such unyielding rules in this area. *See Strickland v. Washington,* 466 U.S. 668, 696, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules."); *see also Roe v. Flores–Ortega,* 528 U.S. 470, 480, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("We ... reject a bright-line rule that counsel must always consult with the defendant regarding an appeal.").

At all events, as the above makes clear, Pilette did have written evidence indicating what she told Coddington and what he told her. Her contemporaneous notes of the meeting and her Motion for Guidance

with the state court of appeals indicate that Coddington chose not to appeal this critical issue. In testifying (not surprisingly) that she did not independently recall a meeting eight years earlier with one of many clients, Pilette merely boosted the credibility of her other testimony. It did not require the district court to refuse to consider the notes and Pilette's testimony regarding what they meant to a lawyer who had handled 500 criminal appeals by that time in her career.

### C.

The district court also found Pilette's performance deficient because she never ensured that Coddington understood she was dismissing his appeal after resentencing. Dist. Ct. Op. at 26–27; JA 133–34. Although she sent Coddington an affidavit seeking consent to withdraw his appeal, he never returned it. JA 292. Coddington also refused to allow anyone at the prison to read his mail for fear of revealing the facts of his offense. JA 289. Rather, he instructed Pilette to communicate with his sister, which she did. JA 292. Only after Coddington failed to return the waiver and his sister moved without leaving a forwarding address did Pilette file a Motion for Guidance to dismiss Coddington's appeal. JA 290.

Even if we assume that Pilette had a duty to ensure that Coddington knew she was dismissing his appeal, the record indicates she did explain the dismissal to him. Pilette's Motion for Guidance indicates that she had earlier "discussed with Defendant [Coddington] that they had prevailed on the only issue raised on appeal and Defendant agreed to dismiss his appeal as of right." JA 87. When asked if she would only include true statements in a filed pleading, Pilette answered: "That's correct. It was probably signed under oath." JA 295.

All of this is consistent with Pilette's testimony that her notes from the meeting with Coddington and the Motion for Guidance indicate that Coddington chose only to appeal the resentencing issue. Having made that decision with respect to the initial appeal, it is difficult to see what benefit a further waiver could provide. Coddington had already waived the right to appeal the voluntariness issue, and his success on the resentencing issue would not have allowed him suddenly to insert the voluntariness issue into the appeal after the successful–and fully concluded–remand. *See People v. Kaczorowski,* 190 Mich.App. 165, 475 N.W.2d 861, 864–65 (Mich.1991) (holding that defendant's failure to appeal the voluntariness of a plea constitutes waiver of the issue on subsequent appeal).

### D.

 The district court lastly determined that Pilette's performance was deficient because she failed to explain to Coddington in 1994 that Michigan's parole policy could change in the future. Dist. Ct. Op. at 28; JA 135. At the time Coddington pleaded guilty and at the time he was resentenced in this case, the Michigan Parole Board generally paroled sex offenders after they had served their minimum sentences. JA 272–73. While Coddington was serving this sentence, Michigan changed its policies and began requiring sex offenders generally to serve their maximum sentences.

In its opinion, the district court offered no case law imposing a duty on appellate counsel to inform clients of the potential for future changes in parole policy–whether those changes could favor inmates or burden them. Neither does Coddington's counsel do so in his appellate brief.

Nor are we aware of any such duty or for that matter the practicability of imposing such a duty. Whether it is a State's views on clemency or parole, both policies are a matter of executive-branch grace, the very flexibility of which defies easy cabining or predictability. *See Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 276, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) ("The Due Process Clause is not violated where ... the clemency and pardon powers are committed, as is our tradition, to the authority of the executive."); *California Dep't of Corr. v. Morales,* 514 U.S. 499, 507–08, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (holding that a change in parole policies without altering the underlying substantive standards does not violate the *Ex Post Facto* Clause). Under these circumstances, the most that an attorney could say to the client is that the State might change these policies in the future and might do so in a way that could help the client or hurt the client. While no lawyer should be discouraged from counseling a client along these lines, it is difficult to understand the duty to do so in a plea setting. For in providing such advice–that the client's actual time in prison could end up being longer or shorter than currently anticipated–the lawyer merely states a truism that even the most sophisticated client could not use in a meaningful way.

### IV.

For these reasons, we REVERSE and REMAND the case to the district court for further proceedings consistent with this opinion.